**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X
DINO PALADINO,                                    :
                                                  :
                          Plaintiff,              :
                                                  :
            - against -                           :        07 Civ. 1579 (DRH) (ARL)
                                                  :
                                                  :
DHL EXPRESS (USA), INC. and,                      :
INTERNATIONAL BROTHERHOOD OF                      :
TEAMSTERS AIR FREIGHT CHAUFFERS,                  :
HANDLERS, WAREHOUSEMEN & ALLIED                   :
WORKERS UNION NO. 295,                            :
                                                  :
                          Defendants.             :
--------------------------------------------------------------X

## DEFENDANT DHL EXPRESS (USA), INC.'S
## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, Defendant DHL Express (USA), Inc. ("DHL" or the "Company") hereby submits this Statement of Undisputed Material Facts, as to which there is no genuine issue to be tried, in support of its Motion for Summary Judgment.

**Plaintiff's Employment with DHL**

1.      Plaintiff Dino Paladino ("Plaintiff") applied for a position as a "Freight Courier" with Airborne Express on or about March 23, 1985.  (*See* Pre-Employment Application for Plaintiff, attached as Exhibit F to the Declaration of Andrew S. Goodstadt ("Goodstadt Decl.")).

2.      Plaintiff was hired on or about April 1, 1985 as a bike messenger.  (*See* Employee Payroll/Personnel Master Records for Plaintiff, dated April 1, 1985, attached as Exhibit G to Goodstadt Decl.; Deposition of Dino Paladino ("Paladino Dep."), attached as Exhibit A to Goodstadt Decl., at 61:16-23, 105:20-23).

3.      On December 9, 1985, Plaintiff became a driver at DHL's JKF facility.  (*See* Employee Payroll/Personnel Master Record for Plaintiff, dated September 9, 1985, attached as Exhibit H to Goodstadt Decl.).

1

4.      In or around January 1993, at Plaintiff's request, Plaintiff was transferred to DHL's

Westbury station as a driver, performing the same duties that he performed at the JFK facility (*See*

Employee Master Record for Plaintiff, dated September 3, 1994, attached as Exhibit K to Goodstadt

Decl.; Paladino Dep. at 116:24-117:2, 6-13, 118:8-13).

5.      Subsequently, Plaintiff voluntarily transferred to DHL's Farmingdale station, where

he performed the same duties.  (*See* Paladino Dep. at 121:12-14, 122:5-11, 123:15-22).

6.      When Plaintiff requested a "hardship transfer," Local 295 assisted Plaintiff in obtaining a

transfer from DHL's FRG station to the ISP station on June 30, 2003.  (*See* Employee Master Record

for Plaintiff, dated March 19, 2003, attached as Exhibit L to Goodstadt Decl.; Paladino Dep. at

127:9-11, 128:12-13, 19-21; Deposition of Dino Paladino by Local 295 ("Paladino Union Dep."),

attached as Exhibit B to Goodstadt Decl., at 85:25-86:4, 22-24).

7.      The ISP station is DHL's facility located in Ronkonkoma, New York (the "ISP station").

(*See* Deposition of Jeffrey Sidorski ("Sidorski Dep."), attached as Exhibit C to Goodstadt Decl, at

6:14-15).

8.      Since approximately 2001, Jeffrey Sidorski was the District Field Services Manager

("DFSM") at the ISP station.  (*See* Sidorski Dep. at 5:22-25, 7:7-12; Paladino Dep. at 128:25-129:2).

As the DFSM, Mr. Sidorski was responsible for managing the operations of the entire ISP station.

(*See* Sidorski Dep. at 6:8-25).

9.      Plaintiff's supervisors while employed at the ISP station included Rocco Russo, Mike

Garcia, John Wallace and Nick Dubanos.  (*See* Sidorski Dep. at 10:15-24; Paladino Dep. at 131:5-

14).

**Plaintiff's Job Duties**

10.     As a driver, Plaintiff's job duties at the ISP station included delivering and helping to

break down freight, delivering and picking up packages, scanning packages, and loading and unloading trucks. (*See* Sidorski Dep. at 8:11-16, 9:2-18; Paladino Dep. at 130:4-6, 133:13-16, 134:2-24).

11.     Plaintiff also was a shuttle driver at the ISP facility. (*See* Paladino Dep. at 130:7-14). As a shuttle driver, Plaintiff was responsible for taking an empty shuttle truck from the ISP station to DHL's JFK facility, to unload freight from an inbound plane onto DHL's truck, and drive the freight back to the ISP station for sorting and delivering. (*See* Paladino Dep. at 132:19-133:22).

12.     Plaintiff's regular shift was from 4 a.m. until 1 p.m. (*See* Paladino Dep. at 132:7-11). On a normal day, Plaintiff performed his duties as a shuttle driver from 4 a.m. to 9 a.m. (*See* Paladino Dep. at 132:12-18). Thereafter, Plaintiff generally helped break down freight and prepare the freight for delivery. (*See* Paladino Dep. at 139:12-25).

**The Collective Bargaining Agreement**

13.     Plaintiff received a copy of the Collective Bargaining Agreement between Airborne Express, Inc. and Local 295 ("CBA"), which has an effective date of February 29, 2004 through February 28, 2009. (*See* Collective Bargaining Agreement Between Airborne Express, Inc. and Local 295, attached as Exhibit M to Goodstadt Decl., at DHL 1; Paladino Dep. at 216:22-217:4).

14.     The CBA sets forth the grievance and arbitration procedures available to DHL employees, such as Plaintiff, who are members of the Local 295 bargaining unit. (*See* Goodstadt Decl., Exhibit M, at DHL 36-38; Deposition of Vincent Bruno ("Bruno Dep."), attached as Exhibit E to Goodstadt Decl., at 16:8-17:5). Under the CBA, grievances involving a discharge are submitted directly to Step. (*See* Goodstadt Decl., Exhibit M, at DHL 37). An employee initiates the grievance process for a discharge by submitting a grievance in writing to his or her District or Station Manager after receiving written notification of such discharge. (*See* Goodstadt Decl., Exhibit M, at DHL 37). If the matter is not resolved at Step 2, the grievance can be taken to a Step 3, which involves a review and decision by the Regional Field Services Manager or designee. (*See* Goodstadt Decl., Exhibit M,

at DHL 37). If the employee is not satisfied with the Step 3 results, Local 295 can submit the grievance to its Executive Board to determine whether the union will pursue the grievance to arbitration. (*See* Goodstadt Decl., Exhibit M, at DHL 37).

15.     The CBA also enumerates the levels of discipline that DHL can impose on its employees who are members of Local 295. (*See* Goodstadt Decl., Exhibit M, at DHL 50; Bruno Dep. at 38:18-39:15). Specifically, the CBA categorizes "serious offenses" as Category "A" offenses that provide DHL with "just and sufficient cause for summary discharge." (*See* Goodstadt Decl., Exhibit M, at DHL 50; Bruno Dep. at 39:20-23). Among the offenses specified as Category "A" offenses is "theft." (*See* Goodstadt Decl., Exhibit M, at DHL 50; Bruno Dep. at 50:19-25).

16.     Under the CBA, "theft" has consistently been interpreted by both DHL and Local 295 to include "theft of time." (*See* Goodstadt Decl., Exhibit M, at DHL 37; Bruno Dep. at 50:22-25; Deposition of John Nuttall ("Nuttall Dep."), attached as Exhibit D to Goodstadt Decl., at 50:12-17, 52:18-24; Affidavit of John Nuttall ("Nuttall Aff.") at ¶ 2).

17.     An employee engages in theft of time if "an employee is not engaged in work during the period of time when he or she is being paid." (*See* Nuttall Dep. at 55:18-22). Plaintiff testified that his understanding of theft of company time is "not working when you were directed to work and doing something else." (*See* Paladino Dep. at 198:16-17, 22-24).

**Plaintiff's Poor Performance and Prior Terminations**

18.     Under the CBA, Plaintiff was subject to progressive discipline for violations of DHL's attendance policy. (*See* Goodstadt Decl., Exhibit M, at DHL 48-49; Paladino Dep. at 189:2-5). Indeed, Plaintiff was cited on several occasions while working at the ISP station for violating DHL's attendance policies. (*See* Step 6 letter to Plaintiff, dated November 5, 2005, attached as Exhibit N to Goodstadt Decl.; Step 7 letter to Plaintiff, dated August 27, 2005, attached as Exhibit O to Goodstadt Decl.; Step 6 letter to Plaintiff, dated April 30, 2005, attached as Exhibit P to Goodstadt Decl.; Paladino Dep. at 183:4-9).

4

19.     On April 30, 2005, Plaintiff received a Step 6 letter for being absent three days and tardy five days in that month. (*See* Goodstadt Decl., Exhibit P; Paladino Dep. at 184:22-185:25).

20.     On August 27, 2005, Plaintiff received a Step 7 letter for being absent three days and tardy five days in that month. (*See* Goodstadt Decl., Exhibit O; Paladino Dep. at 188:15-189:11).

21.     On November 5, 2005, Plaintiff received a Step 6 letter for being tardy three days in October 2005. (*See* Goodstadt Decl., Exhibit N; Paladino Dep. at 191:12-21, 192:4-7, 16-23, 193:2-5).

22.     Plaintiff also received counseling about other violations of DHL's work policies from Mr. Sidorski and/or Mr. Mackey on at least three separate occasions. (*See* Sidorski Dep. at 73:10-17).

23.     The first time Plaintiff received counseling at the ISP station, Plaintiff was driving a shuttle truck from the airport to the ISP station and parked the truck on the eastbound side of Sunrise Highway. (*See* Sidorski Dep. at 73:22-74:2-6). Mr. Sidorski was driving westbound when he saw the truck and, assuming it had broken down, went to see what had happened. (*See* Sidorski Dep. at 74:5-10). When Mr. Sidorski got out of the car, he saw Plaintiff having a conversation with a friend and asked him what had happened. (*See* Sidorski Dep. at 74:10-13). Plaintiff stated that there was no problem, that he was just speaking with a friend. (*See* Sidorski Dep. at 74:12-13). At that point, Mr. Sidorski instructed Plaintiff to return to the ISP station where Plaintiff received verbal counseling for his poor judgment as the truck was parked while it was full of freight. (*See* Sidorski Dep. at 74:14-21).

24.     The second time, on January 18, 2005, Plaintiff parked his truck on the side of Connetquot Avenue. (*See* Handwritten note signed by Mike Mackey, dated January 18, 2005, attached as Exhibit Q to Goodstadt Decl.; Sidorski Dep. at 74:22-23). Mr. Mackey saw the truck as he was driving into work and went to see what was going on. (*See* Goodstadt Decl, Exhibit Q; Sidorski Dep. at 75:2-4; Paladino Dep. at 271:13-24). Plaintiff explained to Mr. Mackey that he had

to pull over to rest because the sun was in his eyes. (*See* Goodstadt Decl., Exhibit Q; Paladino Dep. at 272:18-273:4; Sidorski Dep. at 75:4-6). Messrs. Mackey and Sidorski each met with Plaintiff and explained to him that although safety precautions are appropriate and necessary, Plaintiff needed to communicate immediately such issues to management or dispatch as required. (*See* Goodstadt Decl., Exhibit Q; Sidorksi Dep. at 75:13-76:5).

25.     The third time Plaintiff received counseling at the ISP station for violating DHL's work rules, Mr. Sidorski had seen Plaintiff on a Saturday morning pull his DHL truck into a 7-Eleven during his working time and get out of his vehicle. (*See* Sidorski Dep. at 76:6-8; Paladino Dep. at 276:16-23). Plaintiff explained that he was going to make a phone call, but as he was only five minutes from the station, Mr. Sidorski instructed Plaintiff to return to the station. (*See* Sidorski Dep. at 76:9-13). Mr. Sidorski and Paul Blasucci, Shop Steward for the ISP station, met with Plaintiff, where it was explained to Plaintiff that he should have returned to the station to make the phone call. (*See* Sidorski Dep. at 76:14-23; Paladino Dep. at 277:2-9).

26.     In addition, Plaintiff was terminated a total of four times while employed at DHL, including three for theft of company time. (*See* Paladino Dep. at 63:25-64:15).

27.     First, in November 1994, Plaintiff was terminated for theft of company time while he was working at the Westbury station. (*See* Employee Master Record for Plaintiff, dated January 17, 1995, attached as Exhibit J to Goodstadt Decl.; Paladino Dep. at 17:25-18:3, 195:25-196:6). Specifically, Plaintiff admitted that he intentionally falsified his time records in an effort to be paid by DHL during periods in which he was at his home in Wantaugh and not working. (*See* Paladino Dep. at 196:15-197:20). The station manager, Gary Chardavoyne, terminated Plaintiff for falsifying his cartage records. (*See* Decision by Arbitrator Stanley Aiges in *Airborne Express v. Local 295, IBT*, dated February 27, 1995, attached as Exhibit S to Goodstadt Decl., at L296-56-57; Paladino Dep. at 18:4-8, 196:7-14). Mr. Sidorski was in no way involved with the decision to terminate

6

Plaintiff's employment at that time and had no role in the grievance process. (*See* Paladino Dep. at 195:14-19).

28.     Plaintiff grieved the termination, which was upheld through each step of the grievance process under the CBA. (*See* Paladino Dep. at 201:14-202:4, 203:20-24). Thereafter, Local 295 pursued Plaintiff's case to arbitration in front of Stanley Aiges, the long-time grievance arbitrator under the CBA (including predecessor agreements). (*See* Paladino Dep. at 203:25-204:5; Nuttall Aff. at ¶ 3).

29.     Arbitrator Aiges found that Plaintiff engaged in theft of company time. (*See* Goodstadt Decl., Exhibit S, at L295-60; Paladino Dep. at 207:6-9). Indeed, Plaintiff admitted that he was aware of the fact that Arbitrator Aiges found him "guilty of falsifying [his] cartage records, so as to steal time [that Plaintiff] should have spent performing work." (*See* Goodstadt Decl., Exhibit S, at L295-60; Paladino Dep. at 206:24-207:9).

30.     Although Arbitrator Aiges acknowledged that Plaintiff's offense was one "which arbitrators universally uphold the discharge penalty," Plaintiff was reinstated and his termination was reduced to a time served suspension without pay because other employees at the Westbury station had been treated less harshly for falsifying cartage reports at that time. (*See* Goodstadt Decl., Exhibit S, at L295-60-62; Paladino Dep. at 204:21-205:7, 207:10-14). Plaintiff returned to work on March 6, 1995. (*See* Goodstadt Decl., Exhibit J; Paladino Dep. at 212:17-213:2).

31.     On August 29, 1995, Plaintiff was terminated a second time by Mr. Chardavoyne for leaving an envelope in the front seat of his truck. (*See* Employee Master Record for Plaintiff, dated October 31, 1995, attached as Exhibit I to Goodstadt Decl.; Paladino Dep. at 17:17-24, 214:10-18). After exhausting the grievance procedures, Plaintiff's termination was reduced to an unpaid suspension, and he returned to work on November 13, 1995. (*See* Goodstadt Decl., Exhibit I; Paladino Dep. at 214:19-215:3).

**Termination in January 2006 and Last Chance Agreement**

32.     On January 4, 2006, Plaintiff took a DHL truck, without permission or notice, and left

the ISP station.  (*See* Goodstadt Decl., Exhibit Q; Plaintiff's termination letter, dated January 9, 2006,

attached as Exhibit T to Goodstadt Decl.).  Plaintiff drove the DHL truck to a nearby Hess gas

station, where he parked the truck and fell asleep while he was on the clock and being paid by DHL.

(*See* Handwritten note signed by Mike Mackey, dated January 4, 2006, attached as Exhibit R to

Goodstadt Decl.; Paladino Dep. at 281:17-18, 286:3-12, 289:23-24, 291:18-22).  At no time did

Plaintiff notify, let alone receive permission from, DHL management to take a truck for personal

reasons, and Plaintiff failed to notify management about his whereabouts.  (*See* Handwritten note by

Robert Giammarino, attached as Exhibit U to Goodstadt Decl.; Goodstadt Decl., Exhibit T; Sidorski

Dep. at 24:5-10; Paladino Dep. at 277:14-17, 280:17-20, 292:21-23).

33.     When DHL management tried to locate Plaintiff, Mr. Sidorski learned from a supervisor

that a DHL truck was parked at a Hess gas station that DHL could not use to fill its trucks with fuel,

and he sent two supervisors, Mr. Mackey and Robert Giammarino, to investigate.  (*See* Goodstadt

Decl., Exhibits R, U; Sidorski Dep. at 24:5-25:2).  Upon arrival at the Hess station, Mr. Mackey

knocked on the window of the parked truck, waking up Plaintiff.  (*See* Goodstadt Decl., Exhibit U;

Paladino Dep. at 290:6-17).  Plaintiff admitted he did not know how long he was sleeping.  (*See*

Paladino Dep. at 291:2-8).

34.     Mr. Mackey then instructed Plaintiff to return to the ISP station.  (*See* Goodstadt Decl.,

Exhibits R, T, U; Paladino Dep. at 291:12-15).  When Plaintiff returned to the station, he left

immediately without completing check-in requirements or informing anyone that he was leaving for

the day.  (*See* Goodstadt Decl., Exhibit T; Paladino Dep. at 296:6-24, 301:3-7; Sidorski Dep. at

26:16-19).  Plaintiff also failed to punch out for the day, despite the fact that DHL policy required

Plaintiff to do so.  (*See* DHL's Spring 2006 Courier Answer Handbook, attached as Exhibit V to

Goodstadt Decl.; Paladino Dep. at 297:6-7).

35.     After calling in sick for two days, on January 7, 2006, Plaintiff returned to work and a thorough investigation was conducted into the January 4, 2006 incident at the Hess station. (*See* Investigation letter to Plaintiff, dated January 7, 2006, attached as Exhibit W to Goodstadt Decl.).  As part of the investigation, Mr. Sidorski, Paul Blasucci, Shop Steward, and Austin Cannon, Security Supervisor, conducted a meeting with Plaintiff in which Plaintiff attempted to explain his misconduct.  (*See* Paladino Dep. at 319:5-14, 320:5-321:9; Sidorski Dep. at 26:3-6, 20-24, 27:10-14, 28:3-7).  Pursuant to standard DHL practice, Plaintiff was then taken out of service pending the outcome of the investigation.  (*See* Goodstadt Decl., Exhibit W; Paladino Dep. at 316:21-317:6; Sidorski Aff. at ¶ 3).

36.     After further investigation, on January 9, 2007, Plaintiff was terminated for theft of company time pursuant to the disciplinary provisions of the CBA.  (*See* Goodstadt Decl., Exhibit M, at DHL 50, T; Sidorski Dep. at 25:13-20; Paladino Dep. at 339:11-16; Bruno Dep. at 94:15-22, 95:22-24).

37.     Local 295 pursued a grievance in connection with Plaintiff's termination, which was upheld at the Step 2 hearing on January 10, 2006.  (*See* Plaintiff's Step 3 grievance form, dated January 10, 2006, attached as Exhibit X to Goodstadt Decl.; Paladino Dep. at 345:20-22; Bruno Dep. at 95:18-21).  Subsequently, at the Step 3 hearing on January 19, 2006, Plaintiff's termination was reduced to a time served suspension.  (*See* Last chance agreement, dated January 19, 2006, attached as Exhibit Y to Goodstadt Decl.; Paladino Dep. at 352:7-11; Bruno Dep. at 96:5-10).  As part of DHL's agreement with Local 295 for Plaintiff's reinstatement with an unpaid time served suspension, Plaintiff signed a last chance agreement.  (*See* Goodstadt Decl., Exhibit Y; Paladino Dep. at 352:7-11; Bruno Dep. at 94:8-14).

38.     The last chance agreement signed by Plaintiff explicitly stated that the "Employee is

forewarned that any future incident of like kind will result in the employee's immediate termination." (*See* Goodstadt Decl., Exhibit Y; Bruno Dep. at 105:3-11). Plaintiff understood the ramifications of this agreement. (*See* Paladino Dep. at 352:12-18, 356:19-357:5).

39.     A last chance agreement is only effective for one year, after which an employee is given a clean disciplinary record. (*See* Bruno Dep. at 111:2-21).

**Plaintiff was Terminated in October 2006 for Another Incident of Theft of Time and for Violating His Last Chance Agreement**

40.     On October 9, 2006, after working his scheduled shift from 4 a.m. to 1 p.m., Plaintiff worked an additional afternoon shift because the ISP station was short a few drivers. (*See* Paladino Dep. at 367:16-368:12, 24-25, 369:2-10, 370:3-23). The second shift was a pickup shift, during which time Plaintiff had a schedule of client pickups. (*See* Sidorski Aff. at ¶ 4). Indeed, Plaintiff's pickup schedule was sent to him over his DHL scanner prior to his shift, and included specific time windows that each pickup had to be completed. (*See* Pickup and Delivery Analysis, dated October 9, 2006, attached as Exhibit Z to Goodstadt Decl.; Paladino Dep. at 422:11-18, 460:9-17).

41.     On that day, Plaintiff had three separate gaps in his manifest, which are times when work was not performed, without management approval, when work was available and could have been performed. (*See* Paladino Dep. at 367:14-17; Sidorski Dep. at 44:6-10).

42.     Specifically, the first gap was 65 minutes, the second gap was 25 minutes, and the third and longest gap was 124 minutes. (*See* Goodstadt Decl., Exhibit Z).

43.     The first gap caused a total of six express service failures, where Plaintiff failed to timely deliver packages. (*See* Goodstadt Decl., Exhibit Z; E-mail from John Wallace, dated October 10, 2006, attached as Exhibit AA to Goodstadt Decl.; Paladino Dep. at 380:4-7, 423:23-424:4). Plaintiff admitted that he concealed such service failures from DHL. (Paladino Dep. at 379:19-380:18).

44.     The third gap was between 1:09 p.m. and 3:13 p.m. (*See* Goodstadt Decl., Exhibit Z;

Paladino Dep. at 420:13-23).  During this period, Plaintiff did not perform any services for the Company, despite the fact that there were at least six packages that were ready for pickup and notwithstanding the fact that Plaintiff was on the clock and being paid overtime by DHL.  (*See* Goodstadt Decl., Exhibits Z, AA; Paladino Dep. at 368:11-20, 385:13-17, 444:13-446:16).  Indeed, during this gap, Plaintiff made two pickups outside the scheduled pickup window.  (*See* Goodstadt Decl., Exhibits Z; Paladino Dep. at 385:13-17, 444:13-446:16).

45.     The following day, the supervisors and managers at the ISP station received the gap report from October 9, 2006, which listed the largest gaps from that day, as they do every morning. (*See* Sidorski Dep. at 18:20-19:2, 20:21-21:3; Sidorski Aff. at ¶ 6).

46.     Pursuant to daily practice, the supervisors and managers questioned the drivers who had the most gaps on their driver manifests to determine whether the gaps were justified (*e.g.*, traffic accident, customer not ready, etc.).  (*See* Sidorski Dep. at 18:20-19:2, 20:6-21:6; Sidorski Aff. at ¶ 7).

47.     That morning, on October 10, 2006, John Wallace, Plaintiff's supervisor, spoke with Plaintiff about the gaps in his manifest as was the practice at the station.  (*See* Goodstadt Decl., Exhibit AA; Sidorski Dep. at 10:15-24; Paladino Dep. at 498:17-22, 505:9-14).  When questioned about the first gap, Plaintiff explained that he was feeling sick and represented to Mr. Wallace that he had contacted the dispatcher to inform him of this purported sickness.  (*See* Goodstadt Decl., Exhibit AA).  When Mr. Wallace indicated he would check the message log to confirm Plaintiff's explanation, Plaintiff changed his explanation and stated that he had spoken with the dispatcher upon returning to the building later in the day.  (*See* Goodstadt Decl., Exhibit AA).

48.     Plaintiff then attempted to explain to Mr. Wallace the second gap in his manifest by stating that he returned to the ISP station as he was instructed to do by Mr. Garcia.  (*See* Goodstadt Decl., Exhibit AA).  Since there were no deliveries to pick up at the station, Plaintiff went back out to complete his remaining deliveries and meet another driver to see if that other driver needed

11

assistance on his delivery route. (*See* Goodstadt Decl., Exhibit AA; Paladino Dep. at 385:3-12). Mr. Garcia, however, did not call Plaintiff off his route before he had completed his deliveries and, instead, had instructed Plaintiff to finish his deliveries before coming back to the building. (*See* Letter from Mike Garcia to Carlos Arostegui, dated October 11, 2006, attached as Exhibit BB to Goodstadt Decl.; Paladino Dep. at 381:15-22).

49.     With respect to the third and longest gap, from 1:09 p.m. to 3:13 p.m., Plaintiff told Mr. Wallace that he had repeatedly tried to contact Jimmy Smith, another DHL driver in the area. (*See* Goodstadt Decl., Exhibit AA).  Since Mr. Smith did not need his assistance, Plaintiff claimed that he had no pickups or deliveries to do during that period. (*See* Goodstadt Decl., Exhibit AA; Paladino Dep. at 384:22-385:12).  Although Plaintiff claimed that he had called the dispatcher, he was unable to tell Mr. Wallace at what time he had contacted him and there was no record of any attempt by Plaintiff to contact dispatch or anyone at the ISP station. (*See* Goodstadt Decl., Exhibit AA; Sidorski Aff. at ¶ 5).

50.     During the 124 minute period that Plaintiff did not perform any services for DHL, despite being on the clock, Plaintiff had two scheduled pickups that were ready between 2:00 p.m. and 3:00 p.m. (*See* Goodstadt Decl., Exhibit Z; Paladino Dep. at 444:13-21, 445:22-446:13).  Rather than picking up these ready packages during this period of inactivity, Plaintiff picked them outside of the service window in violation of DHL policy. (*See* Goodstadt Decl., Exhibit Z; Paladino Dep. at 444:18-445:4, 22-25, 446:2-16).  Indeed, the dispatcher had to send Plaintiff a text message at 3:04 p.m. informing him that one of the customers called to complain that no one picked up the packages during the scheduled pickup window, and was going to leave at 3:15 p.m. (*See* "Freeform Messages Sent to/from Route," dated October 9, 2006, attached as Exhibit CC to Goodstadt Decl.; Paladino Dep. at 458:21-460:8).

51.    The following day, on October 11, 2006, Plaintiff attended a meeting at approximately 6:45 a.m. with Mr. Blasucci, Mr. Russo and Carlos Arostegui, Assistant Station Manager, in connection with DHL's investigation into Plaintiff's gaps. (*See* E-mail from Carlos Arostegui, dated October 11, 2006, attached hereto as Exhibit DD to Goodstadt Decl.; Paladino Dep. at 131:15-24). During that meeting, Plaintiff explained that during the first gap he was in the bathroom sick for 65 minutes. (*See* Goodstadt Decl., Exhibit DD). Plaintiff admitted that he failed to inform anyone at DHL about this purported sickness either while he was sick or thereafter. (*See* Goodstadt Decl., Exhibit DD).

52.    Plaintiff then explained that during the second gap he had returned to the ISP station and was told by Mr. Garcia to meet with Mr. Smith. (*See* Goodstadt Decl., Exhibit DD).

53.    Plaintiff further claimed that during the third gap he tried to reach Mr. Smith, but could not, and that he had no pickups ready, despite the uncontested and documented fact to the contrary. (*See* Goodstadt Decl., Exhibits Z, DD). Plaintiff admitted that he did not notify anyone at DHL that he was not able to reach Mr. Smith or that he allegedly had no work to do. (*See* Goodstadt Decl., Exhibit DD). Plaintiff's claim that he suffered a nervous breakdown during the third gap was raised *for the first time* after the Step 3 decision to uphold his termination. (*See* Sidsorski Aff. at ¶ 9).

54.    At the end of the meeting, Plaintiff was issued a "Letter of Investigation" by Mr. Arostegui, which Plaintiff and Mr. Blasucci, as Shop Steward, signed. (*See* Goodstadt Decl., Exhibit DD; Letter of Investigation from Carlos Arostegui, dated October 10, 2006, attached as Exhibit EE to Goodstadt Decl.; Paladino Dep. at 494:21-495:11). The letter informed Plaintiff that an investigation was being conducted into the gaps in his manifest that occurred on October 9, 2006. (*See* Goodstadt Decl., Exhibit EE).

55.    Thereafter, a second meeting was held on October 11, 2006, at approximately 4:30 p.m., with Plaintiff, Messrs. Sidorski, Blasucci, and Arostegui. (*See* E-mail from Jeffrey Sidorski, dated October 12, 2006, attached as Exhibit FF to Goodstadt Decl.). In response to Mr. Sidorski's

request for any information to help explain his gaps, Plaintiff replied that he was in the bathroom during the first gap because he had problems with his stomach and had severe hemorrhoids. (*See* Goodstadt Decl., Exhibit FF; Paladino Dep. at 513:23-514:8, 19-24). Plaintiff explained that during the second gap he came back to the ISP facility and that there was no additional work. (*See* Goodstadt Decl., Exhibit FF). Plaintiff also stated that he had contacted Mr. Smith, who did not need help, so he waited for his pickups during the third gap. (*See* Goodstadt Decl., Exhibit FF; Sidorski Dep. at 61:22-62:13).

56.     At the end of that meeting, Plaintiff was terminated from his employment with DHL because the gaps of October 9, 2006 were deemed to be theft of company time. (*See* Plaintiff's termination letter, dated October 11, 2006, attached as Exhibit GG to Goodstadt Decl.; Goodstadt Decl., Exhibit FF; Paladino Dep. at 515:16-24, 516:6-517:23). Not only was Plaintiff's theft of time a terminable offense under the CBA, but it violated his last chance agreement, executed only nine months earlier. (*See* Goodstadt Decl., Exhibits Y, GG; Sidorski Dep. at 22:19-23:20).

57.     Plaintiff initiated grievance proceedings on October 11, 2006, and the termination was upheld at the Step 2 hearing because DHL had just cause for the termination. (*See* Plaintiff's Step 1 and Step 2 grievance form, dated October 11, 2006, attached as Exhibit HH to Goodstadt Decl.; Paladino Dep. at 522:3-5, 524:6-19).

58.     A Step 3 hearing was held on October 19, 2006 at the ISP station, with Plaintiff, Mr. Sidorski, Chris Sheedy, Regional Field Services Director, Mr. Arostegui and Vincent Bruno, Business Agent of Local 295. (*See* Plaintiff's Step 3 grievance form, dated October 11, 2006, attached as Exhibit II to Goodstadt Decl.; Sidorski Dep. at 95:9-17; Bruno Dep. at 56:15-20, 80:20-81:2; Paladino Dep. at 529:9-11). The termination was upheld by Mr. Sheedy at the Step 3 hearing. (*See* Goodstadt Decl., Exhibit II; Bruno Dep. at 81:3-4; Paladino Dep. at 535:15-19). Mr. Sheedy had no role in the decision to terminate Plaintiff's employment. (*See* Paladino Dep. at 529:12-19; Sidorski Aff. at ¶ 10). Afterwards, Mr. Bruno informed Plaintiff that he would see if the case could

be taken to arbitration, which Plaintiff admitted was in good faith. (*See* Paladino Union Dep. at 64:10-17; Bruno Dep. at 84:2-21). Plaintiff further admitted that he knew that Mr. Bruno tried hard to get Plaintiff reinstated. (*See* Goodstadt. Decl., Exhibit II; Paladino Union Dep. at 68:21-23).

59.    Mr. Bruno personally presented to the Local 295 Executive Board Plaintiff's Step 3 grievance to see if the Local 295 Executive Board would consider pursuing an arbitration on behalf of Plaintiff. (*See* Bruno Dep. at 84:16-21, 86:20-22). Mr. Bruno presented the facts of the case, including the reason for Plaintiff's termination, Plaintiff's explanation for the gaps in his manifest, and the fact that Plaintiff had been on a last chance agreement at the time of his termination. (*See* Bruno Dep. at 88:11-89:9). On October 24, 2006, the Local 295 Executive Board, including Mr. Bruno, voted not to take Plaintiff's case to arbitration. (*See* Executive Board Minutes, dated October 24, 2006, attached as Exhibit JJ to Goodstadt Decl.; Bruno Dep. at 90:14-18).

60.    Plaintiff testified that he did not know why Local 295 decided not to take his case to arbitration, but admitted that reasonable people could disagree as to whether he would have prevailed if his grievance was submitted to arbitration. (*See* Paladino Union Dep. at 69:19-21, 70:17-19). Moreover, Plaintiff admitted that he did not know whether Local 295 was treating him differently than anyone else in that same situation and, further, that he did not have any evidence to show that Local 295 acted inconsistently with respect to Plaintiff's case. (*See* Paladino Union Dep. at 70:20-23, 83:14-17).

**DHL was Unaware of Plaintiff's Alleged Disabilities at the Time of His Termination**

61.    Following his termination from DHL, on April 17, 2007, Plaintiff filed the instant lawsuit against DHL and Local 295 alleging that DHL discriminated against him under New York State law based on his disabilities, and that it breached the CBA when the Company terminated his employment. (*See* Complaint, attached as Exhibit KK to Goodstadt Decl., at ¶¶ 31, 33, 34)

62.    Plaintiff recalls being diagnosed with depression in or around 2001 and 2002 and Celiac

disease in or around 2002. (*See* Paladino Dep. at 72:2-5, 81:3-5). Plaintiff testified that Celiac

disease is an allergy to foods, such as white bread and rice, and identified symptoms such as bloating,

cramping and diarrhea. (*See* Paladino Dep. at 74:10-17). Plaintiff admitted his Celiac disease could

have been treated with a prescribed diet, but he chose not to follow his doctor's instruction. (*See*

Paladino Dep. at 77:14-78:22).

63. Plaintiff admitted that he is not aware of any document in connection with his

employment at DHL in which he informed DHL that he suffered from depression or any digestive

problems or Celiac disease. (*See* Paladino Dep. at 97:5-10, 249:21-250:2).

64. Notably, however, Plaintiff verified, in writing, on his "Medical Examination Report

for Commercial Driver Fitness Determination," that was submitted to the Department of

Transportation for his commercial license, dated May 15, 2003, that he did *not* suffer from any

illness or injury during the last five years, that he did *not* suffer from any digestive problems, and that

he did *not* suffer from any nervous or psychiatric disorder, specifically, severe depression. (*See*

"2003 Medical Examination Report for Commercial Driver Fitness Determination," attached as

Exhibit LL to Goodstadt Decl. at DHL 390; Paladino Dep. at 94:5-13, 95:8-10, 96:13-22, 97:11-23).

65. Plaintiff testified that he understood that the Department of Transportation physical

was a requirement of the Department of Transportation and was necessary to hold a commercial

license. (*See* Paladino Dep. at 70:9-24).

66. Plaintiff signed the document and, in doing so, agreed that "I certify that the above

information is complete and true. I understand that inaccurate, false or missing information may

invalidate the examination and my Medical Examiner's Certificate." (*See* Goodstadt Decl., Exhibit

LL at DHL 390; Paladino Dep. at 93:25-94:4).

67. On June 21, 2005, Plaintiff again certified, in writing, that he did not suffer from any

illness or injury in the last five years and that he did not have any digestive problems or nervous or

psychiatric disorders, specifically severe depression. (*See* "2005 Medical Examination Report for

Commercial Driver Fitness Determination," attached as Exhibit MM to Goodstadt Decl., at DHL 50028). Plaintiff also verified that he was not taking any medication. (*See* Goodstadt Decl., Exhibit MM, at DHL 50028).

68.     Plaintiff testified that he thought Celiac disease was a digestive problem, but that he concealed his Celiac disease from DHL and the Department of Transportation because he did not believe it was important. (*See* Paladino Dep. at 95:8-16). Similarly, Plaintiff testified that the reason he failed to disclose to DHL and the government the fact that he suffered from depression was because he felt that it was personal and did not feel disclosure was necessary. (*See* Paladino Dep. at 97:11-98:3).

69.     Mr. Sidorski testified that at no time during Plaintiff's employment with DHL did Plaintiff ever make DHL aware that Plaintiff suffered from Celiac disease. (*See* Sidorski Dep. at 39:20-24).

70.     In fact, Mr. Sidorski testified that it was not until Plaintiff's Step 3 hearing – several weeks *after* he decided to terminate Plaintiff's employment – that Plaintiff informed anyone at DHL that he allegedly suffered from Celiac disease. (*See* Sidorski Dep. at 69:16-70:16).

71.     Indeed, Plaintiff admitted that he could not recall telling anyone at DHL that he suffered from Celiac disease. (*See* Paladino Dep. at 230:22-24, 231:8-12). Plaintiff also testified that he did not know whether he was discriminated against because he had Celiac disease. (*See* Paladino Dep. at 156:7-16). Although Plaintiff testified that he informed Mr. Sidorski of his alleged depression, Plaintiff was unable to identify any details of such alleged disclosure. (*See* Paladino Dep. at 227:2-230:18).

72.     Mr. Sidorski testified that DHL was never made aware that Plaintiff suffered from depression or a mental illness at any time during his employment. (*See* Sidorski Dep. at 39:25-40:6, 17-22). Similarly, Mr. Bruno testified that he did not have any evidence or information that DHL or any managers at DHL were aware of any alleged mental or emotional disability of Plaintiff. (*See*

17

Bruno Dep. at 114:3-9).  Mr. Bruno also testified that he never knew that Plaintiff was being treated

for depression, despite his 20+ year friendship and business relationship with Plaintiff.  (*See* Bruno

Dep. at 122:2-14).

73.     Mr. Sidorski testified that in connection with Plaintiff's termination in January 2006,

he was not aware that Plaintiff was suffering from depression or taking any medication, and that

Plaintiff did not raise any issues regarding any mental illness.  (*See* Sidorski Dep. at 35:17-36:14).

Similarly, Mr. Bruno testified that during his investigations into Plaintiff's termination for theft of

time in January 2006 on behalf of Local 295, Plaintiff did not raise any alleged mental condition or

other medical condition.  (*See* Bruno Dep. at 97:7-12, 23-25, 98:2-5).

74.     Mr. Bruno also testified that it was not until after Plaintiff was terminated in October

2006 that he learned that Plaintiff suffered from depression.  (*See* Bruno Dep. at 82:2-8).  In fact,

there is no evidence that Plaintiff told anyone at DHL that he suffered an emotional breakdown on

October 9, 2006, and, moreover, the earliest he told anyone at Local 295 was *after* he was terminated

on October 10, 2006.  (*See* Paladino Dep. at 391:5-14, 534:15-24).

75.     When asked whether Plaintiff had any evidence that DHL discriminated against him

based on his alleged disabilities, Plaintiff admitted, "I'm not exactly sure how they did." (*See*

Paladino Union Dep. at 80:2-12).  Plaintiff testified his evidence of discrimination based on his

alleged depression was his subjective belief that he had been treated differently "than other people

who were caught doing the same thing." (*See* Paladino Dep. at 156:21-23, 157:5-13).

76.     To support his belief, Plaintiff identified two other DHL employees, Tony Diomedis and

Steve Avvento as non-disabled employees who allegedly were treated differently than Plaintiff for

the same infraction.  (*See* Paladino Dep. at 157:11-22, 171:25-172:6).  Plaintiff, however, has no

evidence that Mr. Diomedis was caught stealing time, let alone disciplined.  (*See* Paladino Dep. at

163:20-164:2).  Mr. Avvento, on the other hand, was terminated for theft of time and subsequently

reinstated during the grievance procedure.  (*See* Paladino Dep. at 171:4-12).  Significantly, however,

Plaintiff admitted that neither Mr. Diomedis nor Mr. Avvento was on a last chance agreement at the time such alleged incidents took place. (*See* Paladino Dep. at 163:18-19, 171:20-22).

77.     Plaintiff testified that he believed that Mr. Diomedis had fallen asleep but had not been fired. (*See* Paladino Dep. at 162:18-20, 163:13-14). Plaintiff testified that the basis for his belief was that he heard from another driver after his termination – although he was unable to identify who – that Mr. Diomedis had fallen asleep, but he did not know where. (*See* Paladino Dep. at 162:18-163:4, 164:3-15). Plaintiff could not provide any details of Mr. Diomedis' alleged different treatment. (*See* Paladino Dep. at 163:21-164:15).

78.     Indeed, Plaintiff admitted that he had not spoken to Mr. Diomedis, Gerry Gigante, the station manager, or anyone at Local 295, to support his belief that was formed on the basis of inadmissible hearsay from another unidentified driver. (*See* Paladino Dep. at 165:5-9, 166:2-10). Mr. Diomedis, however, worked at a different DHL facility in Farmingdale and he had a different station manager than Plaintiff. (*See* Paladino Dep. at 165:5-9). As Mr. Diomedis was located at a different station, Mr. Sidorski was not Mr. Diomedis' supervisor and had no role whatsoever in disciplinary decisions with respect to Mr. Diomedis. (*See* Paladino Dep. at 165:10-17).

79.     With respect to Mr. Avvento, who worked at the ISP station, Plaintiff testified that he believed Mr. Avvento had been terminated for theft of company time and then reinstated – exactly as Plaintiff was treated in January 2006 when he was terminated for theft of time for the first time at the ISP station. (*See* Paladino Dep. at 166:16-24, 171:4-12, 352:7-11).

80.     In fact, on September 29, 2006, DHL terminated Mr. Avvento's employment for theft of company time for gaps in his manifest. (*See* Steven Avvento's termination letter, dated September 29, 2006, attached as Exhibit NN to Goodstadt Decl.; Steven Avvento's Step 2 grievance form, dated September 29, 2006, attached as Exhibit OO to Goodstadt Decl.). Mr. Avvento grieved the termination, which was denied at the Step 2 hearing. (*See* Goodstadt Decl., Exhibits NN, OO; Paladino Dep. at 168:9-18). At the Step 3 hearing, Mr. Avvento's termination was reduced to a time

served suspension. (*See* Goodstadt Decl., Exhibits NN, OO; Steven Avvento's Step 3 grievance form, dated September 29, 2006, attached as Exhibit PP to Goodstadt Decl.). Plaintiff admitted that he was not aware of any subsequent misconduct of theft of time by Mr. Avvento after Mr. Avvento was reinstated. (*See* Paladino Dep. at 360:3-10; Paladino Union Dep. at 72:17-20).

81.     In fact, Plaintiff is not able to identify a single DHL employee who, while on a last chance agreement, subsequently committed a similar offense and was not terminated. (*See* Paladino Dep. at 360:11-15).

82.     Moreover, each employee at the ISP station (including Plaintiff), and in that station's region, who has been caught stealing time under the CBA has been terminated. (*See* Goodstadt Decl., Exhibits NN; Joseph Colabella's discipline history and attendance history, attached as Exhibit QQ to Goodstadt Decl.; Vincent Fusco's termination letter, dated November 3, 2005, attached as Exhibit RR to Goodstadt Decl.; Raymond Yearwood's termination letter, dated February 14, 2006, attached as Exhibit SS to Goodstadt Decl.; Joseph Pisicchio's termination letter, dated January 14, 2005, attached as Exhibit TT to Goodstadt Decl.; Kenton Cameron's termination letter, dated March 31, 2006, attached as Exhibit UU to Goodstadt Decl.; James Fitanzo's termination letter, dated March 31, 2006, attached as Exhibit VV to Goodstadt Decl.; Robert Bennedetto's termination letter, dated March 31, 2006, attached as Exhibit WW to Goodstadt Decl.; Ken Quiroz's termination letter, dated April 5, 2006, attached as Exhibit XX to Goodstadt Decl.; Vincent Wiggins' termination letter, dated March 23, 2006, attached as Exhibit YY to Goodstadt Decl.; Roger Vega's Step 3 grievance form, dated June 30, 2004, attached as Exhibit ZZ to Goodstadt Decl.).

83.     Plaintiff also identified three individuals whom he believed had been discriminated against by DHL because of their respective disabilities. (*See* Paladino Dep. at 586:2-13). Specifically, Plaintiff testified that Vincent Fusco had a heart problem, that an individual named "Jimmy" had Tay-Sachs disease, and that Thomas O' Keefe suffered from depression. (*See* Paladino Dep. at 586:2-13, 587:11-13).

84.     Plaintiff testified that he believed Mr. O'Keefe, who worked at DHL's Farmingdale facility, had been discriminated against because of his depression when his supervisors, Chris Wyler and Mr. Gigante, allegedly terminated him for no reason.  (*See* Paladino Dep. at 586:16-587:18, 589:10-12).  Plaintiff was unable to provide any details to support his generalized accusation, and admitted that Mr. O'Keefe was reinstated every time.  (*See* Paladino Dep. at 541:10-16, 25, 542:2-16, 587:19-23).  Indeed, Mr. O'Keefe allegedly sought advice from Plaintiff's attorneys, but never pursued any claim of discrimination.  (*See* Paladino Dep. at 541:10-16, 25, 542:2-16, 587:24-588:6).

85.     Moreover, as Mr. O'Keefe was located at a different station, Mr. Sidorski was not Mr. O'Keefe's supervisor and had no role whatsoever in the alleged disciplinary decisions with respect to Mr. O'Keefe.  (*See* Paladino Dep. at 542:17-19, 586:22-587:6, 589:10-12; Sidorski Aff. ¶ 11).

86.     Plaintiff also testified that Mr. Fusco, who worked at the ISP station, had been told by Mr. Sidorski the day prior to undergoing heart surgery that he would be terminated if he did not find a lost package.  (*See* Paladino Dep. at 590:9-23).  Plaintiff admitted, however, that Mr. Fusco had not been terminated, and that he does not know whether DHL took any adverse employment action against him.  (*See* Paladino Dep. at 591:2-7).

87.     Finally, with respect to "Jimmy," the driver with Tay-Sachs disease, Plaintiff testified that he believed "Jimmy" had been discriminated against when DHL allegedly told him that he had to take a certain route, which required him to be in his truck for three hours straight.  (*See* Paladino Dep. at 591:19-17, 23-25, 592:2-6).  Plaintiff admitted that Tay-Sachs disease was a disability that was completely different from his own alleged disability.  (*See* Paladino Dep. at 592:21-593:3).  Messrs. Sidorski and Bruno both testified that this driver was taken out of service because he could not perform his job anymore.  (*See* Sidorski Dep. at 100:13-17, 101:2-10; Bruno Dep. at 57:7-25).

Dated:  New York, New York
       February 20, 2009

Respectfully submitted,

THOMPSON WIGDOR & GILLY LLP

By: _____
       Andrew S. Goodstadt
       Cindy E. Uh

85 Fifth Avenue
New York, NY 10003
Telephone:  (212) 257-6800
Facsimile:   (212) 257-6845

*Counsel for Defendant DHL Express (USA), Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and copy of the foregoing Local Rule 56.1 Statement Of Undisputed Material Facts in Support of Defendant's Motion for Summary Judgment, dated February 20, 2009, was served via overnight delivery, this 20th day of February 2009, upon the following counsels:

To:    Kosta K. Kollef, Esq.
        Law Office of Michael G. O'Neill
        30 Vesey Street, 3rd Floor
        New York, New York 10007

        *Counsel for Plaintiff Dino Paladino*

        Joshua S.C. Parkhurst, Esq.
        Cary Kane LLP
        1350 Broadway, Suite 815
        New York, New York 10018

        *Counsel for Defendant International Brotherhood of Teamsters Air Freight Chauffeurs, Handlers, Warehousemen & Allied Workers Union No. 295*

_____
Cindy E. Uh

Dated: New York, New York
       February 20, 2009