# EXHIBIT M

**COLLECTIVE BARGAINING AGREEMENT**

**Between**

**AIRBORNE EXPRESS, INC.**

**And**

**LOCAL 295, AFFILIATED WITH THE
INTERNATIONAL BROTHERHOOD OF
TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN
AND HELPERS OF AMERICA**

**(February 29,  2004 – February 28, 2009)**

CONFIDENTIAL

DHL 1

## TABLE OF CONTENTS

| SECTION | PAGE |
|---|---|
| PREAMBLE AND WITNESSETH | 1 |
| 1. WAGES | 2 |
| A. Wage Rates For Full-Time Employees Hired Prior To 9/1/88 And For All Those Who Previously Entered The 375 Guarantee Under The Provisions Of Section 7.I (Guaranteed Work Force) Of The Predecessor Collective Bargaining Agreements | 2 |
| 1. Tractor Trailer Drivers | 2 |
| 2. Straight Truck & Van Drivers | 2 |
| 3. JFK Driver/Dockmen | 3 |
| B. Wage Rates For Employees Hired On Or After 9/1/88 | 3 |
| 1. Tractor Trailer Drivers | 3 |
| 2. Full-Time Straight Truck & Van Drivers And JFK Driver/Dockmen | 4 |
| (a) Wage Progression effective 3/1/04 | 4 |
| (b) Wage Progression effective 3/1/05 | 5 |
| 3. Part-Time Straight Truck & Van Drivers And JFK Driver/Dockmen | 6 |
| (a) Wage Progression effective 3/1/04 | 6 |
| (b) Wage Progression effective 3/1/05 | 6 |
| C. Retroactivity | 8 |
| D. Shift Differential | 8 |
| 2. HOURS, PART-TIME PERSONNEL, OVERTIME RATES AND MEAL BREAKS | 9 |
| A. Full-Time | 9 |
| B. Part-Time | 9 |
| 1. Utilization | 9 |
| 2. Full-Time/Part-Time Ratio | 11 |
| 3. Procedure To Achieve Proper Full-Time/Part-Time Ratios | 11 |

i

C. Computation Of Compensable Work Hours        12
D. Overtime                                     12
E. Meal Break                                   12
  1. Full-Time Employees                        12
  2. Part-Time Employees                        13
3. OPERATIONS COVERED                           14
A. Union Jurisdiction                           14
B. Employees Covered                            14
C. Transfer Of Company Title Or Interest        15
D. Change Of Operations Within Jurisdiction Of Union   15
E. Exclusive Performance Of Unit Work By Unit Personnel   16
F. Limited Performance Of Unit Work By Non-Unit Personnel   16
  1. International Forwarder                     16
  2. Couriers                                    16
G. Subcontracting                               17
H. Supervisors Performance Of Unit Work         17
I. Utilization of ABX Linehauls And Sky Courier   18
4. HOLIDAYS                                      19
A. Employees Hired Prior To 9/1/88 And All Those Who
   Previously Entered The 375 Guarantee Under The Provisions
   Of Section 7.I (Guaranteed Work Force) Of The Predecessor
   Collective Bargaining Agreements             19
B. Employees Hired On Or After 9/1/88           20
C. Holiday Bid Procedures                       25
D. Scheduling Of Floating Holidays              22
5. UNION SECURITY AND CHECKOFF                  24
6. SUPERVISORY PERSONNEL                        25
7. SENIORITY                                    26
A. Seniority Principle                          26
B. General Bid                                  26
C. New Full-Time Positions, Full-Time Vacancies Or
   Downgrades To Part-Time                      28

ii

D. Saturday Bid                                 29
E. Seniority Rank And Posting                   30
F. Loss Of Seniority                            30
  (g)(i) Work Related Injury                    31
     (ii) Non-Work Related Injury Or Illness    31
G. Loss Of Chauffeur's License                  32
H. Inter-Bargaining Unit Transfers              32
I. Layoff And Recall                            34
J. Personal Leave Of Absence                    34
K. New Station Opening                          34
L. Merger                                       35
M. Acquisition Or Purchase                      36
8. STEWARDS                                      36
A. Appointment And Duties                       36
9. UNION VISITATION AND ON PREMISES MEETING     42
10. PROTECTION OF RIGHTS                         42
11. UNIFORMS                                     43
12. HEALTH AND WELFARE                           43
A. 1. All Employees Currently Participating In The Local
      295/851 - IBT Employer Group Welfare Fund And Other
      Employees Promoted To Or Hired As Full-Time (As Of
      Their Third (3rd) Anniversary Date Following Their
      Respective Date Of Promotion), And All Those Who
      Previously Entered The 375 Guarantee Under The
      Provisions of Section 7.1 (Guaranteed Work Force) Of The
      Predecessor Collective Bargaining Agreements   43
B. All Other Employees                          45
13. PENSIONS                                     46
A. 1. Full Time Employees Hired Prior To 9/1/88 And All
      Those Who Previously Entered The 375 Guarantee Under
      The Provisions Of Section 7.1 (Guaranteed Work Force) Of
      The Predecessor Collective Bargaining Agreements   46

iii

CONFIDENTIAL

DHL 3

    2. All Other Employees            46
14. DHL @ HOME PROGRAM         49
15. LABOR PRACTICE           50
  D. Time Clocks            50
  E. Paychecks            51
  H. Access To Employee Wage And Time Records And
      Relevant Personnel Records By Stewards, etc.   51
  M. Removal Of Disciplinary Records From File Twelve (12)
      Months From Date Of Occurrence     52
  N. Airport Recovery And Drops       52
  O. Shuttles To And From The Airplane     53
  P. DOT Hour Regulations         53
16. STARTING PLACE, TRAVEL EXPENSES, ETC.   53
17. VACATIONS            54
  A. Employees Hired Prior To 9/1/88     54
  B. Employees Hired On Or After 9/1/88    55
    4. Employees With Less Than One (1) Year Of Service Prior to
      the April 1, Bid         56
    5. Employees With One (1) Or More Years Of Service Prior to
      April 1, Bid          56
  C. Part-Time Employees Promoted To Full-Time During The
      Vacation Year         57
18. FUNERAL LEAVE         59
19. SICK LEAVE           59
  A. Employees Hired Prior To 9/1/88     59
  B. Employees Hired On Or After 9/1/88    60
20. JURY DUTY           61
21. NO STRIKE -- NO LOCKOUT     62
22. GRIEVANCE AND ARBITRATION PROCEDURE   63
23. FEDERAL AND STATE LAWS     67
24. ARMED FORCES         69
25. COMPANY RULES        69

26. MAINTENANCE OF STANDARDS     70
27. APPLICANTS FOR EMPLOYMENT AND
    PROBATIONARY PERIOD       70
28. AIRBORNE SUBSTANCE ABUSE POLICIES AND
    PROCEDURES         72
29. SAVINGS CLAUSE         73
30. NON-DISCRIMINATION       74
  B. 1. Sexual Harassment Policy     75
    2. Sexual Harassment Complaint Procedure   75
31. INVESTIGATORY INTERVIEW OF UNIT EMPLOYEES
    BY MANAGEMENT AND SUPERVISION   77
32. LEAVES OF ABSENCE FOR UNION ACTIVITY   78
33. MISCELLANEOUS         78
  A. Notification To Employees Facing Termination For
    Long-Term Absences       78
  B. Hardship Transfers       79
  C. Light Duty          79
  D. Amnesty          79
  E. Flight Benefits        80
  F. DECAP          80
  G. Airborne Express Tuition Reimbursement Program   81
  H. IBT 401 (k) Plan        81
  I. Employee Stock Purchase Plan     81
  J. DRIVE          82
34. JOINT MANAGEMENT/UNION FAIR TREATMENT
    AND PROFESSIONAL CONDUCT POLICY   82
35. JOINT MANAGEMENT/LABOR COMMITTEE   85
36. DURATION           85
APPENDIX "A" - JURISDICTIONAL MAP     86
APPENDIX "B" - COMPANY RULES     87
  I. Attendance Policy        87
  II. Company Uniform Policy      89

iv

v

CONFIDENTIAL

DHL 4

III. Company Work Rules – Discipline                90
   A. 1. Category "A" Offenses                       91
      2. Category "B" Offenses                       93
      3. Category "C" Infractions                    94
      4. Category "D" Infractions                    96
APPENDIX "C" - IBT LAPEL  PIN                        99
APPENDIX "D" - STIPULATION PERMANENTLY ENDING
TWO TIER WAGE AND BENEFIT SYSTEM                     100

vi

**AGREEMENT** entered into between **AIRBORNE EXPRESS, INC.,** hereinafter called   the **"Employer,"** the **"Company"** or **"Airborne Express"**, and **LOCAL UNION 295 AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA,** hereinafter called the **"Union"** or **"Local 295"** to govern all hours, wages and working conditions herein set forth to continue from February 29, 2004 to February 28, 2009.

### W I T N E S S E T H

**WHEREAS,** Local 295 is the sole and exclusive Collective Bargaining Agent on behalf of the employees hereinafter described; and

**WHEREAS,** the Employer and the Union are desirous of entering into an agreement relating to wages, benefits and other terms and conditions of employment which will provide methods of harmonious cooperation between the Employer and its employees and the Union, and to that end accomplish fair and peaceful adjustment of disputes which may arise without work stoppages or other interruptions of the Employer's business during the life of this Agreement;

**WHEREAS,** the parties agree that is fundamental that Airborne Express has the right to run its business and direct its work force, subject to the conditions set forth herein.  It is equally fundamental that if any dispute occurs about any terms of that agreement or about any action by Airborne Express, that dispute must be handled through the grievance process, unless otherwise provided herein.

**WHEREAS,** Airborne Express and Local 295 recognize that workers and management employees should be treated with dignity and respect and that managers and workers alike must perform their jobs professionally and that their behavior must reflect positively on Airborne Express and Local 295. Neither party will tolerate any behavior which

1

CONFIDENTIAL

DHL 5

constitutes harassment, insubordination, intimidation, or which discriminates or retaliates against any worker for properly exercising his/her rights under the collective bargaining agreement, particularly the right to submit grievances and to have them handled fairly and expeditiously. Nor shall either party tolerate such actions when directed against a supervisor or manager who is engaged in the proper discharge of his managerial duties.

**NOW, THEREFORE,** in consideration of the mutual covenants herein contained, it is mutually agreed as follows:

**SECTION 1:     WAGES.**

   A.   **Wage Rates For Full Time Employees Hired Prior to 9/1/88 And For All Those Who Previously Entered the 375 Guarantee Under the Provisions of Section 7 I. (Guaranteed Work Force) Of The Predecessor Collective Bargaining Agreements.**

      **Classification, Effective Date And Wage Rate**

| 1. | **Tractor Trailer Drivers** | |
|---|---|---|
| | 3/1/04 | $22.70 |
| | 3/1/05 | $23.20 |
| | 03/1/0 | $23.75 |
| | 3/1/07 | $24.40 |
| | 3/1/08 | $25.10 |

| 2. | **Straight Truck & Van Drivers** | |
|---|---|---|
| | 3/1/04 | $22.45 |
| | 3/1/05 | $22.95 |
| | 3/1/06 | $23.50 |
| | 3/1/07 | $24.15 |
| | 3/1/08 | $24.85 |

2

| 3. | **JFK Driver/Dockmen** | |
|---|---|---|
| | 3/1/04 | $22.285 |
| | 3/1/05 | $22.785 |
| | 3/1/06 | $23.335 |
| | 3/1/07 | $23.985 |
| | 3/1/08 | $24.685 |

The wage rates herein above set forth shall be deemed effective as of the date indicated and are applicable to all employees as of the date on which they commence their employment. The minimum weekly rate for part-time employees shall be computed on the basis of twenty-five (25) hours per week.

   B.   **Wage Rates For Employees Hired On Or After 9/1/88.**

    1.  **Tractor Trailer Drivers**

     (a)  **Employees hired on or after 9/1/88 who were promoted to the Tractor Trailer Driver classification prior to 9/1/91.**

All employees hired on or after September 1, 1988, who were subsequently promoted to the classification of Tractor Trailer Driver prior to September 1, 1991, shall be paid in accordance with the wage scale set forth in Section 1.A.1 of this Agreement.

     (b)  **Employees hired on or after 9/1/88 who are promoted to the Tractor Trailer classification any time on or after 9/1/91.**

The following wage scale for the Tractor Trailer Driver classification shall be applicable only to employees hired on or after September 1, 1988, who subsequently are promoted to the Tractor Trailer Driver

3

CONFIDENTIAL

DHL 6

classification at any time on or after September 1, 1991:

| Effective Dates | Wage Rates |
|---|---|
| 3/1/04 | $22.70 per hour |
| 3/1/05 | $23.20 per hour |
| 3/1/06 | $23.75 per hour |
| 3/1/07 | $24.40 per hour |
| 3/1/08 | $25.10 per hour |

All such individuals, however, shall be paid less than the applicable scale rate during their initial twenty-four (24) months in the Tractor Trailer Driver classification after promotion in accordance with the following wage progression formula:

**Time In Tractor Trailer Driver Classification After Promotion (i.e., Time in Grade).**

| | |
|---|---|
| On promotion | 90% of applicable top rate |
| After 12 months | 95% of applicable top rate |
| After 24 months | 100% of applicable top rate |

Nothing herein contained shall result in a reduction of wages for any Tractor Trailer Driver receiving a wage rate higher than the wage scale set forth above.

   2. **Full-Time Straight Truck & Van Drivers And JFK Driver/Dockmen**

**Wage Progression**

   (a) **Effective 3/1/04**

4

| Length of Completed Service | Wage Rates |
|---|---|
| Start | $10.00 |
| After 06 Months | $10.00 |
| After 12 Months | $10.00 |
| After 18 Months | $11.00 |
| After 24 Months | $11.50 |
| After 30 Months | $12.00 |
| After 36 Months | $12.50 |
| After 42 Months | $13.00 |
| After 48 Months | $13.50 |
| After 54 Months | $14.00 |
| After 60 Months | $14.50 |
| After 66 Months | $15.00 |
| After 72 Months | $18.50 |
| After 84 Months | $19.00 |
| After 96 Months | $19.40 |
| After 108 Months | $19.90 |
| After 120 Months | $22.45 |

(b) **Effective 3/1/05**

| Length of Completed Service | Wage Rates |
|---|---|
| Start | $11.00 |
| After 06 Months | $11.00 |
| After 12 Months | $11.50 |
| After 18 Months | $11.75 |
| After 24 Months | $12.00 |
| After 30 Months | $12.25 |
| After 36 Months | $12.50 |
| After 42 Months | $13.00 |
| After 48 Months | $13.50 |
| After 54 Months | $14.00 |
| After 60 Months | $14.50 |

5

DHL 7

| | |
|---|---|
| After 66 Months | $15.00 |
| After 72 Months | $18.50 |
| After 84 Months | $19.00 |
| After 96 Months | $19.40 |
| After 108 Months | $19.90 |
| After 120 Months | $22.95 |
| After 120 Months Effective 3/1/06 | $23.50 |
| After 120 Months Effective 3/1/07 | $24.15 |
| After 120 Months Effective 3/1/08 | $24.85 |

### 3. Part-Time Straight Truck & Van Drivers And JFK Driver/Dockmen.

(a) **Effective 3/1/04**

| Length of Completed Service | Wage Rates |
|---|---|
| Start | $ 9.00 |
| After 06 Months | $ 9.00 |
| After 12 Months | $10.00 |
| After 18 Months | $11.00 |
| After 24 Months | $11.50 |
| After 30 Months | $12.00 |
| After 36 Months | $12.25 |
| After 42 Months | $12.50 |
| After 48 Months | $13.00 |
| After 54 Months | $13.25 |
| After 66 Months | $13.50 |
| After 72 Months | $15.00  Top Rate |

(b) **Effective 3/1/05**

| Length of Completed Service | Wage Rates |
|---|---|
| Start | $10.00 |

6

| | |
|---|---|
| After 06 Months | $10.00 |
| After 12 Months | $11.00 |
| After 18 Months | $11.25 |
| After 24 Months | $11.75 |
| After 30 Months | $12.00 |
| After 36 Months | $12.25 |
| After 42 Months | $12.50 |
| After 48 Months | $13.00 |
| After 54 Months | $13.25 |
| After 66 Months | $13.50 |
| After 72 Months | $15.00 Top Rate |

(c) **Further wage adjustments for part-time Straight Truck & Van Drivers and JFK Driver/Dockmen who (i) have seventy-two (72) or more months of completed service prior to 3/1/04 and/or (ii) who complete seventy-two(72) months of service during the term of this Agreement.**

(i) Any and all employees who have completed seventy-two (72) or more months of service prior to March 1, 2004 shall receive a wage adjustment effective 3/1/04, in the sum of thirty cents ($0.30) per hour; additional wage adjustments for such individuals in the sum of thirty cents ($0.30) per hour shall be provided on each subsequent March 1st falling within the term of this Agreement (i.e., employee with 72 months as of 7/22/03 will be paid at the rate of $15.30 on 3/1/04, $15.60 on 3/1/05, $15.90 on 3/1/06, $16.20 on 3/1/07 and $16.50 on 3/1/08).

(ii) Any and all employees who complete seventy-two (72) months of service after 3/1/04 and during the term of this Agreement, shall be paid at the top rate of $15.00 per hour; additional wage adjustments in the sum of thirty cents ($0.30) per hour shall be provided on each subsequent March 1st falling thereafter within the term of this Agreement (i.e., employee with 72 months as of 9/15/04 will be paid at

7

CONFIDENTIAL

DHL 8

the rate of $15.00 per hour; thereafter he/she shall be paid $15.30 on 3/1/05; $15.60 on 3/1/06, $15.90 on 3/1/07 and $16.20 on 3/1/08).

C. **Retroactivity.**

The wage increases set forth herein shall be retroactive to 3/1/04.

D. **Shift Differential.**

1.  All employees hired prior to September 1, 1991 whose shift commences between 2:00 P.M. to and including 7:00 A.M. shall receive three dollars ($3.00) per day over the wage scale listed above. The three dollars ($3.00) shall be added to the wage scale in computing the employee's regular rate of pay for all purposes. The foregoing shift differential shall not be applicable to employees hired on or after September 1, 1991. It is understood and agreed, however, that the Employer will not staff shifts falling between the 2:00 P.M. and 7:00 A.M. differential window with newly hired personnel for the purpose and intent of substantially reducing the number of employees currently receiving shift differential pay.

2.  All unit personnel hired on or after September 1, 1991 to and including April 13, 1992, shall be entitled to a shift differential in the amount of twenty-five cents ($0.25) for all regularly scheduled hours of work commencing between 2:00 P.M. to and including 7:00 A.M.

3.  1 unit personnel hired on and after April 13, 1992 shall receive a shift differential in the sum of twenty-five cents ($0.25) for all regularly scheduled hours of work commencing between 7:00 P.M. and 5:59 A.M.

4.  The shift differential payments provided in (2) and (3) above shall not be added to an employee's base wage scale for the purpose of computing the benefits provided in this Agreement.

8

**SECTION 2:   HOURS, PART-TIME PERSONNEL, OVERTIME RATES AND MEAL BREAKS.**

A. **Full-Time.**

A full-time employees' work week shall be guaranteed to consist of five (5) consecutive days, eight (8) hours each day, within the employee's bidded seven (7) day period. In addition, the existing number of full-time straight eight (8) hour recovery shifts starting prior to 0700 as of the ratification date (i.e., 3/12/04) of this Agreement, shall be guaranteed for as long as there are part-time starts prior to 0700. Moreover, the existing number of full-time straight eight (8) hour shifts starting prior to 0900 where the incumbent has four (4) or more years seniority as of the ratification of this Agreement shall be guaranteed for as long as there are part-time starts prior to 0900.

B. **Part-Time.**

The Employer may continue to employ part-time personnel to fulfill its operational needs subject to the terms and conditions set forth in this Agreement.

1.  **Utilization.**

(a)  The regular work week for part-time employees shall be guaranteed to consist of at least a minimum of twenty-five (25) hours work, Monday through Friday. The normal part-time employees shall be guaranteed five (5) consecutive days of work, Monday through Friday. The normal part-time work day will consist of a minimum of four (4) hours. If a particular part-time employee works more than six (6) hours per day thirty (30) days in a sixty (60) day period (excluding absenteeism replacement), then the Company shall establish a full-time position. That position shall be offered to part-time employees on the basis of terminal

9

seniority. It is the intent of the parties that no subterfuge shall be used to prevent part-time employees from receiving full-time upgrades.

The Company will continue its current practice with respect to accommodation, whereby any employee seeking an accommodation on account of school, second job, or family care commitments, files a written request for accommodation with the Company, whereupon the Company makes a good faith determination based on operational need, and with the understanding that an accommodation will not be unreasonably withheld. If the request is approved, then the resulting accommodation shall be valid for the entire bid period, and the employee will not be directed to work in a contrary manner.

(b) Start times for part-time positions may be changed by the Employer up to one (1) hour per day, based on operational need. The Company shall attempt to contact the employee at least one (1) hour prior to his/her start time, provided, however, if the employee does not receive such notification, and reports to work, then the one (1) hour slide shall be reduced to thirty (30) minutes.

(c) All of the part-time positions at each terminal shall have a bidded start time. Provided, however, the Company may rebid the bottom fifteen percent (15%) of the part-time seniority list in response to operational needs, but no more than two (2) times in any bid period. The rebid may take effect five (5) days after notice of the operational need to do so. The Company will not switch a.m. bids to the p.m. during such rebid, but will continue to have the right to do so at the regular bid.

(d) Part-time shifts shall not be scheduled back-to-back. There shall be a minimum of two (2) hours separating the end of one scheduled part-time shift from the beginning of another scheduled part-time shift, in any given day. Regardless of the length of a part-time shift, all part-time shifts will be considered to be five (5) hours in length for the purpose of determining compliance with this provision.

(e) The Company may maintain all existing part-time shifts scheduled to start prior to 0700 at any terminal so long as it maintains the number of full-time shifts starting prior to 0700 which existed at that terminal on the date of the ratification of the predecessor 3/1/95 – 2/28/99 Collective Bargaining Agreement. New part-time shifts scheduled to start prior to 0700 may be created without limitation only at hub terminals (i.e., ELZ, LIQ, SWF, ISP, or any replacement hub). In situations other than those involving hub terminals, the Company may schedule additional part-time starting prior to 0700 at any terminal provided that for each additional part-time shift with a start prior to 0700 an additional full-time shift with a start time prior to 0700 must be added for that terminal (i.e., one (1) additional full-time shift for one (1) additional part-time shift).

(f) In the event that a part-time employee passes up an opportunity to upgrade to full-time status, or in the event that a full-time employee bids on a part-time position, that employee must wait until a vacancy or a new full-time position is created in order to bid for that full-time position.

2. **Full-Time/Part-Time Ratio.**

Effective March 1, 2004 and for the duration of the Agreement the ratio of full-time to part-time personnel shall be maintained at a minimum of sixty-two percent (62%) to thirty-eight percent (38%). These ratios shall be maintained during the periods set forth herein pursuant to the procedure described in subsection (3) below.

3. **Procedure To Achieve Proper Full-Time/Part-Time Ratios.**

(a) The parties' intent is to remain as close as possible to the applicable ratios set forth in B.(2) above. Recognizing, however, that the foregoing percentage may fluctuate from time to time due to the nature of the Employer's business, the parties shall convene at least once every

10

11

DHL 10

three (3) months to review and make appropriate adjustments to ensure compliance with applicable ratios.

(b) All promotions made pursuant to B(3)(a) above, shall be assigned by operational need, as determined by the Company. Such employees will be promoted within the terminal in which they are currently working.

### C. Computation of Compensable Work Hours.

Employees' time worked shall be computed from time required to report at the garage or terminal and to the time of return to the same garage or terminal.

### D. Overtime.

Hours worked in excess of eight (8) per day and all work on a Saturday shall be paid at the overtime rate listed at time and one-half (1 ½). All work performed on Sunday shall be paid for at the listed double time (2x) rate. Employees who successfully bid a sixth (6th) or seventh (7th) day shall be guaranteed the hours contained within their bidded shift at time and one-half (1 ½) for the sixth (6th) day and double time (2x) for the seventh (7th) day. Employees who successfully bid a Saturday or Sunday shall likewise be guaranteed the hours contained within their bidded shift. There shall be no pyramiding of overtime. Employees shall not be forced to work more than ten (10) hours on any shift on a recurring basis, except in the case of unforeseen operational emergencies.

### E. Meal Break.

1. **Full-Time Employees.**

(a) A day's work for a full-time employee shall be exclusive of one

(1) hour for lunch, which period shall not start before the end of the fourth hour and not later than the sixth hour.

(b) If an employee is called in prior to the start of his/her bidded shift, the employee may take his/her meal break at their bidded time or earlier (to correspond with the actual start time) at the employee's option, provided, it does not interfere with a.m. deliveries.

2. **Part-Time Employees.**

Part-time employees shall not be entitled to a meal break during their part-time work day. If, however, such employees are required to work more than eight (8) hours, they shall receive seven (7) hours at straight time; one (1) hour at time and one-half (1 ½) for the no lunch and be compensated at the rate of time and one-half (1 ½) for all hours worked in excess of eight (8). Moreover, it is understood and agreed that the Employer, in the exercise of its discretion and in accordance with its operational needs and requirements, may direct a part-time employee to take an unpaid meal break of one (1) hour. If, however, such meal break is directed and taken, the employee shall be guaranteed to work at least eight (8) hours. The meal break shall commence between the start of the sixth (6th) and not later than the start of the seventh (7th) hour.

3. The Employer shall not direct a full-time straight eight (8) hour employee to take a meal break and then cover that employee's route during the break with a part-time employee who has worked beyond five (5) hours on the same day.

4. The Employer shall not require an employee to punch in or out for lunch, except as required on scanners or similar automated on-road devices.

F. Effective March 1, 1995, all van and straight truck drivers at the

12

13

DHL 11

Employer's Gateway JFK terminal shall be reclassified as JFK Driver-Dockmen, for bidding purposes only.   Such drivers (i.e., those being reclassified) shall continue to perform the full pickup and delivery functions.

## SECTION 3:  OPERATIONS COVERED.

### A.  Union Jurisdiction.

The execution of this Agreement on the part of the Employer shall cover all truck drivers, helpers, switchers, platform men, motor lift truck operators, mechanics, garage employees and fuelers, and such other employees as may be presently or hereafter represented by the Union within the jurisdiction of the Union. The jurisdiction of the Union shall consist of, but shall not be limited to, all shipments moving into and out of all airports, all piers and all heliports within the areas designated on the map attached hereto as "Appendix A" including but not limited to: JFK, LaGuardia; Newark; Stewart Field; White Plains; MacArthur; Teterboro; Bridgeport; Republic.

### B.  Employees Covered.

Employees covered by this Agreement shall be construed to mean, but not limited to, any driver, chauffeur, or driver-helper operating a truck, tractor, motorcycle, passenger or horse drawn vehicle or any other vehicle operated on the highways, streets or private roads for transportation purposes when used to defeat the purposes of this Agreement.  The term "Employee" also includes, but is not limited to, all employees used in dock work (switching), checking (dragline), stacking, loading, unloading, scanning, sorting, routing, labeling, handling, shipping, receiving, assembling, staging, including, but not limited to, exclusively leased, owned or chartered air craft on a recurring basis, garage work and fueling and such other employees as may be

14

presently or hereafter represented by the Union.

### C.  Transfer Of Company Title Or Interest.

This Agreement shall be binding upon the parties hereto, their successors, administrators, executors and assigns.  In the event an entire operation or any part thereof is sold, leased, transferred, or taken over by sale, transfer, lease, assignment, receivership or bankruptcy proceeding, such operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof.  The Employer shall give notice of the existence of the Agreement to any purchaser, transferee, lessee, assignee, etc. of the operation covered by this Agreement or any part thereof, including rights only.  Such notice shall be in writing with a copy to the Union, at the time seller, transferor, or lessor executes a contract or transaction as herein described.   The Union shall also be advised of the exact nature of the transaction and reserves the right to veto any of the above named transactions if any of the above named procedures are not adhered to by the Employer.

### D.  Change Of Operations Within Jurisdiction Of Union.

In the event the Employer changes its operations within the jurisdiction of the Union, the present employees and present contract shall prevail at the new terminal(s) or location(s), and the displaced employees or the employees affected shall have a right in keeping with their seniority to move to the new terminal(s) or location(s) with all seniority rights.  In the event the Employer moves outside the jurisdiction of the Union and has no existing terminal(s) or branch(es), he shall first offer employment to present employees who are affected or will be affected at the new terminal(s) or branch(es).  In the event the Employer operates more than one terminal or branch and closes an existing terminal or branch and thereby increases the number of employees in the remaining terminal(s) or branch(es), the employees affected by the closing of the terminal(s) or

15

CONFIDENTIAL

DHL 12

branch(es) shall have full seniority rights, wages and hours presently enjoyed in the area previously serviced.

E. **Exclusive Performance Of Unit Work By Unit Personnel.**

The operation of all trucks, tractors, trailers or any other vehicle owned by or leased to, by or through the Employer, while used for delivery and/or pick-up in the jurisdiction of this Union, shall be performed exclusively by employees of the Employer covered by this Agreement.

F. **Limited Performance Of Unit Work By Non-Unit Personnel.**

Except as otherwise expressly provided below, the bargaining unit work set forth in Paragraphs A-E above, shall be performed exclusively by unit personnel and not by supervisors, management or any other non-unit personnel:

1. **International Forwarder.**

The Employer and the Union agree that in those situations where aircraft departure does not permit the timely and efficient sorting and labeling of outbound International Express shipments (i.e., IEP and SMPX shipments) by unit personnel, then and only then, such work may be performed by the Employer's designated International Forwarder.

2. **Couriers.**

It is further agreed that the Employer may continue to utilize its messengers within the unit covered by the Collective Bargaining Agreement between the Employer and Local 851, IBT to perform messenger functions (e.g., pick-up and delivery of packages by non-motorized vehicle, scanning, sorting, routing, labeling, loading, unloading, receiving and processing of packages at the messenger centers or customer location and including those packages dropped off by drivers

16

for outbound shipping) as per past practice. It is understood that the Local 851 messenger/courier unit shall not be assigned to handle packages weighing in excess of twenty-five (25) pounds per package, which will continue to be handled by employees represented by Local 295.

G. **Subcontracting.**

The Employer agrees that no work or services of the kind, nature or type covered by, presently performed, or hereafter assigned to the Collective Bargaining Unit will be subcontracted; provided, however, that the Employer may continue to subcontract in those instances which are now permitted by the Union; and provided, further, that once the Employer discontinues subcontracting with its current subcontractors, it will not be permitted to subcontract thereafter unless the Employer secures the Union's prior written permission. The Company shall maintain its existing practice with respect to the utilization of International couriers and its own 295 unit work force at JFK in connection with International express shipments, unless future operational needs dictate otherwise (i.e., changes in volume, flights or designated gateways, etc.).

H. **Supervisors Performance Of Unit Work.**

The bargaining unit work set forth in Paragraphs A-E shall not be performed by supervisors or other employees not covered by this Agreement, except in the following limited circumstances:

1. For the direct training of unit employees in the proper performance of work duties; and

2. In non-recurring, unforeseen emergencies only if all available means have been exhausted, including overtime. (If, however, the

17

emergency work cannot be performed by exhausting all available means, including overtime, the Employer may do anything it can to get the work done.)

I. **Utilization OF ABX Linehauls And Sky Courier.**

1. The parties expressly understand and agree that the work performed by Sky Courier as well as the linehauls performed by ABX do not constitute bargaining unit work under the provision of Paragraph F. above. Accordingly, nothing herein contained shall preclude, prevent, impair or in any way restrict Airborne Express from entering into a contract with ABX for the performance of an unlimited number of ABX linehauls originating from points outside the geographic areas designated in Appendix "A" and bound for any terminal covered hereunder and vice versa (i.e., in-bound as well as out-bound). An ABX linehaul, however, shall not be used to transport a shipment originating at a terminal covered hereunder directly to another terminal covered hereunder.

2. Linehauls shall not interface (pick-up or drop-off) directly with a customer within the geographic area covered in Appendix "A", except to pick-up or drop-off a tractor trailer load (minimum 50% filled and not to include "C" containers). Such linehauls may not proceed to more than one (1) customer location and may only pick up additional freight at the domiciliary covered terminal. In such instances, the Local 295 unit employee(s) shall be assigned to travel to the customer's location and shall perform any loading, scanning, labeling or other work which is required to be performed other than driving the linehaul. No such tractor trailer load shall be consigned to ABX without a Union unit employee being present.

3. The parties expressly understand and agree that Sky Courier shall not be used to transport any freight consigned to Airborne Express for pickup or delivery, including Airborne Express airport counter

18

recoveries and drops, within Local 295 jurisdiction.

4. In the unlikely event an existing shuttle is eliminated as the result of a multi-stop ABX linehaul, the Company shall upgrade the most senior part-time employee domiciled at the affected station to full-time status.

5. Nothing herein contained shall preclude or prevent management, supervisors and/or security personnel from performing security and audit re-scanning.

**SECTION 4: HOLIDAYS.**

A. **Employees Hired Prior To 9/1/88 And All Those Who Previously Entered The 375 Guarantee Under the Provisions Of Section 7.I. (Guaranteed Work Force) Of The Predecessor Collective Bargaining Agreements.**

1. The following days shall be considered holidays under this Agreement: New Year's Day, Memorial Day, Independence Day, Labor Day, Good Friday or Yom Kippur (employee option), Thanksgiving Day, Day After Thanksgiving Day, Christmas Eve Day, Christmas Day, Employee's Birthday and six (6) floating holidays. Five (5) of the six (6) floating holidays may be converted to an extra week of vacation at the employee's option.

2. (a) All hours worked on the following holidays shall be paid for at the rate of two and one-half (2-1/2) times the regular rate of pay, with a minimum guarantee of eight (8) hours work or pay for full-time employees and five (5) hours work or pay for part-time employees, in addition to the holiday pay: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day.

19

(b) All hours worked on the following holidays shall be paid for at the rate of two (2) times the regular rate of pay, with a minimum guarantee of eight (8) hours work or pay for full-time employees and five (5) hours work or pay for part-time employees in addition to the holiday pay: Good Friday or Yom Kippur, Christmas Eve Day and Day After Thanksgiving.

3.  Hours worked on such Saturday that is a holiday requiring a two and one-half (2-1/2) time hourly rate, shall be paid for at the rate of four (4) times the regular rate of pay, and holidays with a double time rate of pay shall be paid for at three and one-half (3-1/2) times the regular rate of pay with a minimum guarantee of eight (8) hours work or pay for full-time employees and five (5) hours work or pay for part-time employees.

4.  All hours worked on such Sunday that is a holiday requiring a two and one-half (2-1/2) time hourly rate shall be paid at the rate of five (5) times the regular rate of pay, and holidays with a double time (2x) rate of pay shall be paid for at four (4) times the regular rate of pay with a minimum guarantee of eight (8) hours work or pay for full-time employees and five (5) hours work or pay for part-time employees, provided the holiday is not observed on Monday, in which case the holiday pay would be paid for Monday's work.

5.  The past practice regarding subsections A1., 2., 3. and 4. above, including employee's option to work and Impartial Chairman Stanley Aiges' interpretation (i.e., July 27, 1994 award), shall continue to apply.

B.  **Employees Hired On Or After 9/1/88.**

1.  (a)  Employees hired on or after September 1, 1988, shall be entitled to receive the following paid holidays: Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day and New Year's Day.  In addition, such employees shall receive their

20

birthday off with pay and additional floating holidays in accordance with their length of service, as follows:

| Length of Service | Number Of Floating Holidays |
|---|---|
| Up to twelve (12) months | 1 |
| Twelve (12) but less than twenty-four (24) months | 2 |
| Twenty-four (24) but less than One hundred twenty (120) months (i.e., 10 years) | 3 |
| One hundred twenty (120) or more months | 5 |

(b)  Effective April 1, 2006, each full-time employee who has completed one hundred twenty (120) or more months of service on or after April 1, 2006, shall be entitled (on his/her tenth (10th) anniversary date) to receive a maximum of six (6) floating holidays.

2.  All hours worked on the following holidays shall be paid for at the rate of two and one-half (2½) times the regular rate of pay, with a minimum guarantee of eight (8) hours work or pay for full-time employees, and five (5) hours work or pay for part-time employees in addition to the holiday pay: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day.

3.  Hours worked on such Saturday that is a holiday requiring a two and one-half (2½) time hourly rate, shall be paid for at the rate of four (4) times the regular rate of pay with a minimum guarantee of eight (8) hours' work or pay for full-time employees and five (5) hours work or pay for part-time employees.

4.  All hours worked on such Sunday that is a holiday requiring a two and one-half (2½) time hourly rate shall be paid at the rate of five (5)

21

times the regular rate of pay, with a minimum guarantee of eight (8) hours work or pay for a full-time employee and five (5) hours work or pay for a part-time employee, provided the holiday is not observed on Monday, in which case the holiday pay would be paid for Monday's work.

## C. Holiday Bid Procedures.

1. In accordance with the operational needs of the business and in the exercise of its discretion, the Employer may require employees to report to work and perform duties on a day customarily observed as a contract holiday.

2. In such circumstances, the Employer shall determine the number of employees and shifts needed to work on the holiday and offer the available work for bid pursuant to the seniority principle set forth in Section 7 A. of the contract. The Employer may schedule all full-time shifts or a combination of full-time and part-time shifts. It may not, however, only schedule part-time shifts.

3. Should the Employer desire to have part-time as well as full-time shifts on such contractual holiday, it may do so as long as the bids are alternated between part-time and full-time shifts, as follows: the initial bid shall be for a part-time shift followed, as needed, by a full-time bid and alternating thereafter on the very same basis until manpower needs for holiday coverage have been fully satisfied.

## D. Scheduling of Floating Holidays.

1. Floating holidays shall be posted for bid along with the annual posting of the vacation schedule. Floating holidays which are not bid shall be requested by the employee at least seventy-two (72) hours in advance. The floaters shall be scheduled by the Employer with due

22

consideration for seniority and for maintaining efficiency of Company operations.

2. For all employees hired prior to 9/1/88, and for all those who previously entered the 375 Guarantee under the provisions of Section 7. I. (Guaranteed Work Force) of the predecessor Collective Bargaining Agreements, all earned but unused floaters shall be paid in April of each contract year

3. For all employees hired on or after 9/1/88, all earned but unused floaters will be paid on the employee's anniversary date.

E. No employee shall work on his/her birthday. If the employee's birthday falls on any of the above listed holidays, then that employee shall have the option to celebrate his/her birthday on either the scheduled day before or the scheduled day after the listed holiday.

F. Any employee covered by this Agreement working three (3) days or nights in any seven (7) day period during which any of the listed holidays occur, but who does not elect to work on the holiday, nonetheless receives one (1) day's pay for the holiday. This shall apply if the holiday falls on Saturday or Sunday.

G. Employees who elect to work on an evening prior to a holiday and whose work ends on a holiday, shall work the hours necessary to complete that day's work at the regular rate of pay and the regular overtime rate shall be paid thereafter until the regular starting time of the next day at which time the holiday hourly rate shall apply until he completes his work.

H. Employees who elect to work on a Saturday, Sunday or holiday evening and whose work ends on the following day, shall be paid at the Saturday, Sunday or holiday rate until he has completed his work.

23

**SECTION 5:  UNION SECURITY AND CHECKOFF.**

A.  It shall be a condition of employment that all employees of the Employer covered by this Agreement who are members of the Union in good standing on the effective date of this Employment shall remain members in good standing or pay all periodic dues, initiation fees and assessments as required by the Union and those who are not members on the effective date of this Agreement shall, on or after the thirty-first (31st) day following the effective date of this Agreement or the execution thereof, whichever is later, shall become and remain members in good standing in the Union or shall pay initiation fees and periodic dues and assessments as required by the Union.  It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its effective date or the execution thereof, whichever is later, shall on or after the thirty-first (31st) day following the beginning of such employment become and remain members in good standing in the Union or pay initiation fees and periodic dues and assessments as required by the Union.  An employee who has failed to acquire, or thereafter maintain, membership in the Union as herein provided, or to pay initiation fees or periodic dues shall be terminated seventy-two (72) hours after his Employer has received written notice from an authorized representative of the Union, certifying that membership has been, and is continuing to be, offered to such employee on the same basis as all other members and, further, that the employee has had notice and opportunity to make all dues or initiation fee payments.

B.  In the event of any change in the law during the term of this Agreement, the Employer agrees that the Union will be entitled to receive the maximum Union security which may be lawfully permissible.

C. The Employer shall deduct from the wages of employees covered by this Agreement, periodic dues, properly authorized assessments and initiation fees uniformly required as a condition of membership in the

24

Union.  Such deductions shall be made bi-weekly (or weekly at the Union's option) from the wages of each employee who files with the Employer a written assignment authorizing such deduction, which assignment shall not be irrevocable for a period of more than one year, or beyond the termination date of this Agreement, whichever occurs sooner.  Such dues, initiation fees, and assessments as and when deducted, shall be forwarded to the duly authorized representatives of the Union on a monthly basis.  Properly authorized assessments shall be deemed a part of the dues structure of the Local Union, and shall be deducted in accordance with the dues deduction authorization provided by the Union.

D.  When the Employer actually makes a deduction for dues, initiation fees and assessments, in accordance with a statement received from the Union, it shall remit same and in the event such deduction was made and the Employer fails to remit such monies to the Union, it shall be assessed twenty percent (20%) liquidated damages.  When an employee who is on check-off is not on the payroll for any reason, the employee must make arrangements with the Union to pay such dues in advance.  In the event the Employer is in violation of this section, after receipt of seventy-two (72) hours written notice of specific delinquencies, the Union may take any economic action against such Employer regardless of any other provisions of this Agreement.

E.  The Union shall indemnify and hold the Employer harmless from all monetary liabilities resulting from a judgment, decree or order issued by a court of competent jurisdiction, arbitral panel or administrative agency against the Employer in connection with action taken by the Employer at the express request of the Union for the purpose of complying with the provisions of this Article.

**SECTION 6:  SUPERVISORY PERSONNEL.**

All unit employees shall abide by and comply with all work directives

25

and instructions responsibly issued by the Employer and its supervisory personnel.

## SECTION 7: SENIORITY.

### A. Seniority Principle.

1. Seniority shall prevail, in that the Employer recognizes the general principle that senior employees shall have preference to choose their shifts. Seniority does not give an employee the right to choose a specific unit, run, trip, load or assignment. Terminal seniority rather than Company seniority shall be used for all purposes, except layoff and recall.

2. Employees shall be placed on the seniority list as of their first date of hire with the unit covered by this Agreement. Seniority rights for employees shall prevail. Seniority shall be measured by length of service with the Employer as a bargaining unit employee. Employees entering the unit on the same day under the provisions of Paragraph H. herein shall be placed on the seniority roster in order of Company seniority; newly hired personnel entering the unit on the same day shall be placed on the seniority roster by alphabetical order.

3. In all other areas, including overtime bidding (i.e., Saturday, Sunday or holiday coverage), the seniority principle alone will be recognized, unless otherwise specified in this Agreement.

### B. General Bid.

1. All shifts shall be posted for bid once each year commencing February 1, and a second may be posted to be effective on September 1st of each succeeding contract year. The February and September bids must be completed within four (4) weeks of posting. Moreover, the

26

current general bids may be changed or rebid in response to significant operational changes upon two (2) weeks advance notice and the consent of the Union, which shall not unreasonably be withheld. In the event bids are not completed within either of the applicable time periods, the Employer shall assign all such unbid shifts to available employees in order of seniority. Employees bidding on such shifts must be duly qualified to perform such work. The Company will post full-time vacation replacement bids in conjunction with the general bid up to a maximum of ten percent (10%) of the work force per terminal. Such employees may be used to cover scheduled vacations and/or other absences, as needed. Once assigned to a specific replacement shift, the employee shall remain thereon for that entire week. Employees bidding such shifts shall be notified on a weekly basis of available shifts for the following week, which shifts shall be awarded by seniority.

(a) Any of the foregoing shifts which are not used to fill in for a vacation or other absence shall return to their bidded A.M. or P.M. start time, which shall be when the majority of A.M. or P.M. shifts occur. All vacation replacement positions in addition to those in effect on ratification shall be upgrades.

(b) The Employer will maintain during the life of the Agreement a minimum of one thousand (1000) full-time bids with an A.M. start in the terminals covered hereunder. In addition, all bidded Tractor Trailer shifts shall be straight eight (8) hour shifts.

(c) Except as provided in Section C. 1. below, it is understood and agreed that with respect to general bids only, full-time employees may only bid for full-time positions and part-time employees may only bid for part-time positions in accordance with their seniority as a full-timer or as a part-timer. However, where there are extra bids in full-time or part-time categories, seniority principles will be observed.

27

CONFIDENTIAL

DHL 18

**C. New Full-Time Positions, Full-Time Vacancies Or Downgrades To Part-Time.**

1. A new full-time position, or a permanently vacated full-time position where the Company opts to replace (or is required to replace as provided in Paragraph C. 2. below), shall be bid by terminal seniority. Once filled, the back fill of that full-time shift, if replaced, shall be bid by terminal seniority. If no one bids, the Company shall hire for that position. The foregoing shall not preclude the hardship transfer program in effect since the first quarter of 1994.

2. Except as otherwise provided in this sub-paragraph and in Section 7 K.6. of the Agreement, the number of full-time positions in effect at each terminal as of the ratification date of the predecessor (3/1/95 – 2/28/99) Collective Bargaining Agreement, shall be maintained for the life of this Agreement. The foregoing guarantee, however, shall become null and void in the event of a layoff or series of layoffs within the bargaining unit which directly reduces the number of part-time employees three percent (3%) or more below the allowable maximum levels permitted under the provisions of Section 2 B.2 (Full-Time/Part-Time Ratios). This guarantee shall be restored only if and when more than 97.0% of the laid off personnel have been recalled or replaced.

(a) Full-time employees desiring to downgrade to a part-time position for legitimate reasons may do so, provided consent thereto is granted by both Airborne Express and Local 295. Such consent shall not unreasonably be withheld.

(b) Except as otherwise provided in Paragraph (d) herein, upon the commencement of the downgraded part-time position, the employee's wages and benefits shall henceforth be computed and be determined solely as a part-time employee under the provisions of this contract.

28

(c) Following the downgrade, the employee may not thereafter bid up to a full-time position unless an additional (i.e., "new") or vacant position is available. Moreover, should such employee upgrade to a full-time additional or vacant position as aforesaid, the employee may not thereafter seek another downgrade for the life of the contract or for two (2) years, whichever is greater.

(d) Full-time employees, who are participating in the Welfare Plan under the provisions of Section 12 A.1 of the Collective Bargaining Agreement and thereafter downgraded to a part-time position, shall immediately re-acquire full-time participation in such fund (subject to the express provisions of the current Collective Bargaining Agreement) in the event they upgraded under the provisions of Paragraph (c) above within two (2) years from the date of the downgrade. If, however, an employee upgrades as aforesaid more than two (2) years following the date of the downgrade, future participation in the Fund shall be provided in accordance with the provisions of Section 12 A.1.(a)-(d) of the current Collective Bargaining Agreement. (The provisions set forth in 2(a)-(d) above, shall not be applicable to those employees expressly covered by Appendix "D" 2(a)-(b) of the Agreement).

**D. Saturday Bid.**

1. Saturday bids will be filled by each terminal. Should any terminal have a problem filing a Saturday bid, qualified unit personnel within the terminal shall be forced to fill the vacant shift in reverse order of seniority (i.e., least senior first, etc.).

2. As long as the Employer utilizes a five (5) hour bid shift on a Saturday in a terminal, the Employer guarantees to maintain at least the same number of Saturday full-time straight eight (8) hour bidded shifts in such terminal that were in effect on September 1, 1991. However, no more than fifty percent (50%) of the total number of straight eight (8)

29

                    DHL 19

hour Saturday shifts may be bid for five (5) hours (i.e., if there are ten (10) straight eight (8) hour shifts for a Saturday, there may be five (5) five (5) hour shifts for such Saturday. Additional shifts shall be subject to the same overall limitation).

3. For employees regularly scheduled to a Tuesday to Saturday shift, all work performed on such Saturday shall be payable at the rate of time and one-half (l½). Saturdays not worked due to contractual vacations, sick days, employee's birthday, contractual holidays and floating holidays shall likewise be payable at the rate of time and one-half (1 ½). For employees scheduled to work Monday to Friday, all hours worked on a shift scheduled to commence on Saturday shall be paid at the rate of time and one-half (1-½).

E. **Seniority Rank And Posting.**

Within thirty (30) days after the signing of this Agreement, the Employer shall post in a conspicuous place at the Employer's terminal, a list of employees arranged according to seniority. A new updated list provided by the Employer shall be posted every sixty (60) days thereafter. Claims for corrections to such lists must be made to the Employer within ten (10) days after posting and after such time the lists will be regarded as correct. Any controversy over the seniority standing of any employee on such lists if raised within such ten (10) day period shall be submitted to the grievance procedure established in this Agreement.

F. **Loss Of Seniority.**

Seniority shall be broken only by:
(a) Discharge.

(b) Voluntary quit.

· 30

(c) No work or lay off for more than one (1) year.

(d) Failure to respond to a notice of recall.

(e) Unauthorized leave of absence.

(f) Unauthorized failure to report to work for three (3) consecutive days when work is available.

(g) (i) **Work Related Injury.**

Failure, refusal and/or inability to return to work fully capable of performing the essential functions of the job, within eighteen (18) months following the employee's absence from work as the result of a work related medically substantiated  disability or injury, unless a longer period is required by the ADA to provide a "reasonable accommodation for a qualified individual with a disability".

(ii) **Non-Work Related Injury Or Illness.**

Failure, refusal and/or inability to return to work fully capable of performing the essential functions of the job, within one (1) year following the employee's absence from work as the result of a non-work related medically substantiated  disability or injury, unless a longer period is required by the ADA to provide a "reasonable accommodation for a qualified individual with a disability."

(h) Except as otherwise provided in Paragraph H. below (Inter-Bargaining Unit Transfers), voluntary leaving of the classification of work covered by this Agreement and remaining in the employ of the Employer in some other capacity.

31

CONFIDENTIAL

DHL 20

### G.  Loss Of Chauffeur's License.

In the event the employee shall suffer a revocation of his chauffeur's license because of violation of any laws by the Employer, the Employer shall provide suitable and continued employment for such employee, at not less than his regular earnings at the time of revocation of the license, for the entire period of revocation of license and shall be reinstated in the seniority he held prior to revocation of his chauffeur's license, after his chauffeur's license is restored.

### H.  Inter-Bargaining Unit Transfers.

In accordance with the parties' agreement, as confirmed and adopted by and between the Employer and sister Local 851, IBT on October 17, 1994, inter-bargaining unit transfers between the Employer/Local 851 messenger unit and either the Employer/Local 851 clerical unit or the Employer/Local 295 driver unit shall be effectuated as follows:

1.  Whenever a new part-time position becomes available in the work force, it will be offered to eligible employees, regardless of their current unit affiliation, before hiring from the outside.

2.  To be eligible for inter-bargaining unit transfer, an employee must:

(a)  File a written request for bargaining unit transfer with his/her supervisor, specifying the unit and geographic area for which such transfer is sought.  That request shall be effective for twelve (12) months, and must be renewed thereafter.

(b)  Demonstrate the qualifications necessary to fill that position, as required by the Company (e.g., passing a customer service exam, international exam, typing proficiency, licenses, etc.), as the case may be.

32

(c)  Have not previously transferred from one bargaining unit to another, during the life of the current contract.

3.  Where two (2) or more employees are equally qualified, as determined by the Employer in the exercise of its sound discretion, the new part-time position shall be offered to the qualified employee with the most Company seniority.

4.  When an employee transfers to another bargaining unit, he/she shall be governed by the terms and conditions of the contract covering that bargaining unit only.  That employee shall receive the wage rate and benefits entitlements set forth herein, based on his/her date of hire, provided, however, that no employee shall suffer a reduction in pay or benefits as a result of such transfer.  All other seniority rights, including but not limited to layoff, recall, bidding, etc. shall be based on his/her date of transfer into the new bargaining unit.  Any disciplinary step accrued in the old unit shall automatically transfer into the new one.

5.  Provided, however, (a) if within thirty (30) calendar days following the effective date of the transfer, the employee does not satisfy the probationary period requirements of the new bargaining unit position or otherwise simply wishes to return to his/her former unit, then the employee may return to such former unit within the aforesaid thirty (30) calendar day period, based on the principle of Company seniority and even though this may result in the layoff of a junior employee in the unit to which he/she timely returned; and/or (b) if the employee in the new bargaining unit to which he/she transferred is subject to layoff within three (3) years following the effective date of such inter-bargaining unit transfer, then the employee may return to his/her former unit, based on the principle of Company seniority, so long as he/she meets the requirements of Paragraph (2)(b) above, and even though this may result in the layoff of a junior employee in the old bargaining unit.

33

### I. <u>Layoff And Recall</u>.

In the event it becomes necessary to reduce the work force, the Employer shall layoff unit personnel in accordance with seniority. When the force is again increased, the employees are to be returned to work in the reverse order in which they were laid off. In the event of a recall, the laid off employee shall be notified by certified mail with a copy to the Union and if the employee fails to comply, he shall lose all seniority rights under the Agreement and shall be considered a voluntary quit.

### J. <u>Personal Leave Of Absence</u>.

Any employee desiring a personal leave of absence from his employment without pay or other benefits shall secure written permission from both the Union and the Employer. The maximum personal leave of absence shall be for thirty (30) days and may be extended for like periods. Permission for extension must be secured from both the Union and Employer. During the period of absence the employee shall not engage in gainful employment in any industry. Failure to comply with this provision shall result in the complete loss of seniority rights for the employee.

### K. <u>New Station Opening</u>.

1. When a new Airborne facility opens within the jurisdiction of the Union and some of the work is moved from an existing terminal to the new one, employees within the terminal from which the work has been transferred shall follow the work to the new terminal. The number of such employees following the work shall equal the amount of transferred work.

2. In those situations where not enough employees bid to the new terminal, the Employer will force, in reverse seniority, enough employees

34

to fill the existing jobs at that time. The forcing will be by the type of job (i.e., by full-time or part-time shift).

3. A full-time driver may avoid being forced to the new terminal, provided he/she exercises terminal seniority and bids down to an available position in his/her current terminal.

4. Those employees, if any, who are forced by seniority to follow the work and who want to return to the terminal from which they had been forced, must tell their Shop Steward and their District Manager. Their name will be put on a list kept at the local station. A copy of that list will be sent to the Regional Manager's office and the Union office.

5. The Employer warrants that it will not open a full service Airborne station without full-time positions being made available at such new station (i.e., new terminal may not be staffed solely with part-time employees).

6. The opening of the new station shall not automatically result in the creation of additional full-time straight eight (8) hour shifts. Accordingly, as between both terminals (i.e., the new station and the station from which the work had been transferred) the total number of full-time straight eight (8) hour shifts shall at least equal but need not exceed the total number of full-time straight eight (8) hour shifts that were in effect at the station from which the work had been transferred immediately prior to the opening of the new station.

### L. <u>Merger</u>.

When two (2) or more Employers merge their operations within the jurisdictional area of the Union, then the employees of the respective Employers shall be placed on one seniority roster in the order of the earliest date of hire of each of the employees with their respective

35

Employer.

### M. **Acquisition Or Purchase.**

When one Employer acquires or purchases control of the business of another Employer within the jurisdictional area of the Union, then the employees with less than two (2) years of service with the Employer so acquired or purchased shall be placed at the bottom of the acquiring or purchasing Employer's seniority roster in the order of their payroll, or Employer seniority with the former Employer, and employees with more than two (2) years of service shall be treated in the same manner as a merger under this Agreement.

## SECTION 8: STEWARDS

### A. **Appointment And Duties.**

The Employer recognizes the right of the Union to designate Job Stewards and alternates from the Employer's seniority list. The authority of Job Stewards and alternates so designated by the Union shall be limited to, and shall not exceed, the following duties and activities:

1. The investigation and presentation of grievances in accordance with the provisions of the Collective Bargaining Agreement.

2. The collection of dues when authorized by the appropriate Local Union official.

3. The transmission of such messages and information which shall originate with, and are authorized by the Local Union, or its officers, provided such messages and information:

(a) have been reduced to writing, or

36

(b) if not reduced to writing, are of a routine nature and do not involve work stoppages, slow-downs, refusal to handle goods, or any other interference with the Employer's business.

4. (a) (i) In each terminal covered by the Collective Bargaining Agreement (excluding the airport hubs currently located at JFK and Elizabeth terminals and relocated airport hubs), the Union shall designate one (1) primary steward (a.m.) and one (1) alternate steward (p.m.). The primary steward shall remain in the terminal for up to four (4) hours during the morning peak (a.m. route breakdown) during which time he/she shall perform his/her functions as steward, as defined in subparagraphs A.1., 2., 3. and 6. herein, and available dock or barn work as assigned by management with the operations covered, as defined in Section 3 (Operations Covered), of the Collective Bargaining Agreement, provided, however, that the performance thereof does not interfere with the performance of such stewards duties.

(ii) For the balance of the shift the primary steward may be assigned dock, barn or route work (including driving), as defined in Section 3 (Operations Covered) of the Collective Bargaining Agreement, as management deems appropriate. It is understood and agreed, however, to the extent that there is available dock or barn work, it shall be assigned to the steward. It is further understood and agreed that management shall not be required to keep a steward present at the terminal or dock to perform dock or barn work which is sporadic or de minimus. This does not, however, give management the right to perform such sporadic or de minimus work in any non-emergency circumstance.

(iii) The designation of primary steward time may be changed by mutual agreement of the steward and the Station Manager.

(b) (i) The alternate steward shall remain in the terminal for up to two (2) hours during the p.m. peak (p.m. outbound dock operation)

37

during which time he/she shall perform the function of steward, as defined in subparagraphs A.1., 2., 3. and 6. of the Collective Bargaining Agreement, and available dock or barn work as assigned by management within the operations covered, as defined in Section 3 of the Collective Bargaining Agreement, provided, however, that the performance thereof does not interfere with the performance of such steward duties.

(ii)   For the balance of the shift, the alternate steward may be assigned dock, barn or route work (including driving), as defined in Section 3 (Operations Covered) of the Collective Bargaining Agreement.

(c)   <u>Saturday Overtime Opportunities – Primary Steward</u>.

(i)   The primary steward (or alternate in the absence of the primary steward) may bid for a Saturday morning shift and shall have super-seniority for such purposes to enable him/her to be present for the handling of grievances and the performance of other steward functions, as defined in sub-paragraphs A.1., 2. and 3. of the Collective Bargaining Agreement. The steward shall remain in the terminal for up to two (2) hours during the morning peak (a.m. route breakdown) during which time he/she shall perform his/her functions as steward, as defined in subparagraph A.1., 2. and 3. of the Collective Bargaining Agreement, and dock or barn work as assigned by management within the operations covered, as defined in Section 3 (Operations Covered) of the Collective Bargaining Agreement, provided, however, that the performance thereof does not interfere with the performance of such steward duties.

(ii)   For the balance of the shift, the steward may be assigned dock, barn or route work (including driving) on the same basis as set forth in 4.(a)(ii) above.

(d)   <u>Primary And Alternate Stewards At The Airport Hubs Currently Located In JFK And Elizabeth Terminals.</u>

38

The primary stewards at the airport hubs currently located in JFK and Elizabeth terminals (and relocated airport hubs), shall perform duties in accordance with the provisions of Paragraph 4(a)(i) and (c)(i) above. However, for the balance of the shift, the primary steward shall perform available barn or dock work, shuttle work and/or airport recovery work, as assigned by management.  (Route work shall not be assigned).   The alternate stewards at the aforesaid hubs shall perform duties in accordance with the provisions of 4(b)(i) and (ii) above.

5.   <u>Daily Overtime Opportunities</u>.

Overtime work, if any, that may occur in connection with the performance of  a particular route shall stay with that route.  Overtime assignments, however, to cover employee absences shall be offered to unit personnel, including stewards, on the basis of terminal seniority.  If available work in the terminal or on the dock is required to be performed on an overtime basis, the steward may utilize super-seniority to bid for same.  Nothing herein contained shall be construed to require the Employer to assign work to a steward on an overtime basis that otherwise could reasonably be performed by other unit personnel on straight time.  It is understood and agreed, however, that the Employer will not call in a part-time employee for the sole purpose of precluding a steward from performing an available daily overtime assignment on the dock or in the barn.

6.  (a)  The performance of duties on behalf of the Union by the primary steward away from the Employer's premises, upon prior advance notification to the supervisor on duty.  In the event the performance of such duties by the primary steward expressly concerns Airborne, he/she shall be paid by the Employer at regular straight-time rates in connection therewith up to but not in excess of sixteen (16) hours per calendar quarter.

39

(b)   Moreover, the Union shall be entitled to schedule one "paid" training session which may be attended either by the primary or alternate steward, for up to but not in excess of eight (8) hours per session, each quarter during the term of the current Agreement.  Such "paid" stewards' training sessions shall take place on Saturdays on a date to be selected at the commencement of each quarter by Airborne.  Airborne shall compensate each steward who attends such training sessions with eight (8) hours of straight time pay for each session.

(c)   In the negotiations for the successor Collective Bargaining Agreement, the Company shall pay up to but not in excess of seven (7) stewards designated by the Union as members of the Union's negotiation team, at regular straight-time rates, up to but not in excess of their forty (40) hour weekly guarantee.

B.   The performance of steward duties during work time and the use of Company phones and office equipment by stewards shall not be abused. Should the Employer believe that a steward is abusing or otherwise improperly taking advantage of the steward duties provided herein, the Employer shall promptly bring such matter to the attention of the Union.  If a satisfactory resolution is not achieved, the Employer may submit the matter directly to the Impartial Chairman for final resolution.

C.   Job Stewards and alternates have no authority to take strike action, or any other action interrupting the Employer's business, except as authorized by official action of the Union.  The Employer recognizes these limitations upon the authority of Job Stewards and alternates, and shall not hold the Union and/or its officers or agents liable for any unauthorized acts.  The Union reserves the right to remove the Shop Steward at any time, for the good of the Union.  The Steward shall not be discriminated against by the Employer for the faithful performance of his/her duties as Steward.

40

D.   One (1) Steward at each terminal covered by this Agreement shall be granted super-seniority for layoff and recall.  Any additional application of super-seniority for Stewards must be justified as being directly related to the proper performance of the Steward's duties as Steward and permitted by applicable law.  Each Shop Steward shall have a bid start time.  Moreover, no Shop steward shall be granted automatic overtime.

E.   1.   Stewards are employees of Airborne Express and have no managerial or supervisory authority.  Management has the sole authority to direct employees in the performance of their duties.  Management may not interfere in the performance of shop steward labor relations functions as set forth in subparagraphs A.1., 2., 3. and 6. above.

2.   Nothing in this Article shall limit the right of a steward (or alternate steward when acting as steward) from performing steward duties, as defined in subparagraphs A.1., 2., 3.  and 6., when required as the exigency of the situation may require.

3.   In the event a part-time employee is elected or appointed as a steward, he/she shall be assigned to a full-time shift.

4.   If the primary steward has a scheduled absence, excluding last minute "call-offs", the alternate steward may assume the shift of the primary steward at the discretion of the Union business agent or other designated Union officer.  If the alternate steward is absent, no employee shall be designated as an alternate steward to replace him/her.

5.   The present practice of stewards' use of phone and office equipment will be maintained for the life of this Agreement.

41

CONFIDENTIAL

## SECTION 9:  UNION VISITATION AND ON PREMISES MEETING.

A.  The Union's Representative may visit and have access to the Employer's covered terminals and/or other properties covered by this Agreement at reasonable times during regular business hours for the purpose of adjusting disputes, investigating working conditions and ascertaining that the agreement is being adhered to.

B.  For purposes of this Section of the Agreement only, the term "Union Representative" refers to individuals actively employed and paid by either the International or Local Union, and excludes any and all actively employed unit employees including Shop Stewards.

C.  The Union Representative, upon arrival at any terminal covered hereunder, shall announce his/her presence to the Employer and, during the course of such visit, the Union Representative shall so conduct himself/herself as not to interfere with the operations of the office or other work areas within the Employer's premises.

D.  Group meetings must occur in non-work areas only when no attendee (including the Steward, unless the Steward is on his/her Steward duty time, i.e., four (4) hours for the primary steward and two (2) hours for the alternate steward) is on Company paid time.  Such meeting shall not be unruly or disruptive.  Company rules (i.e., Appendix B) shall apply.

## SECTION 10:  PROTECTION OF RIGHTS.

A.  It shall not be a violation of this Agreement and it shall not be cause for discharge or disciplinary action if any employee refuses to perform any service which his Employer undertakes to perform as an ally of an Employer or person whose employees are on strike, and which service,

42

but for such strikes, would be performed by the employees of the Employer, a person on strike.

B.  No employee covered by this Agreement can be subjected to a polygraph test.

## SECTION 11:  UNIFORMS.

The Employer agrees that if any employee is required to wear any kind of uniform as a condition of employment, such uniform shall be furnished by the Employer, free of charge, at the standard required by the Employer.

## SECTION 12:  HEALTH & WELFARE.

A.  The Employer agrees that the Trust Agreement establishing the Local 295/Local 851 Employer Group Welfare Fund shall be deemed to be as though fully set forth herein and the terms thereof shall be deemed binding upon it as a signatory to the Agreement of Trust made and establishing the Local 295/Local 851 – IBT Employer Group Welfare Fund.  It is further agreed that the Union may be considered as an Employer for the purpose of making contributions to the Local 295/Local 851 – IBT Employer Group Welfare Fund on behalf of employees and officers of the Union.

1.  **All Employees Currently Participating In The Local 295/851 – IBT Employer Group Welfare Fund And Other Employees Promoted To Or Hired As Full-Time (As Of Their Third (3rd) Anniversary Date Following Their Respective Date Of Promotion), And All Those Who Previously Entered The 375 Guarantee Under The Provisions Of Section 7. I. (Guaranteed Work Force) Of The Predecessor Collective Bargaining Agreements.**

43

CONFIDENTIAL

DHL 26

(a) The Employer weekly contribution rate to the Local 295/Local 851 IBT Employer Group Welfare Fund (the "Welfare Fund") for each week in which the employee appears on the Employer's payroll, on behalf of each such employee covered by this Section shall be remitted, as follows:

| | |
|---|---|
| 3/1/04 | $180.00 |
| 3/1/05 | $195.00 |
| 3/1/06 | $210.00 |
| 3/1/07 | $229.00 |
| 3/1/08 | $248.00 |

(b) Employees promoted to a full-time position and/or individuals hired as full-time employees shall be entitled to enroll and participate in the Welfare Fund and the Employer shall remit contributions thereto as of the third (3rd) anniversary date of their employment following their respective dates of promotion, provided there are at least eight (8) weeks in the calendar quarter in which such third (3rd) anniversary date falls. If not, participation in and contributions to such Welfare Fund shall commence as of the first day of the following calendar quarter.

(c) Until such time as the eligibility period for participation in the Welfare Fund has been fulfilled, the Employer shall continue to provide medical insurance to such individuals under its Medical Plan.

(d) Effective March 1, 2006, the provisions of (b) above shall become null and void and thereafter all full-time employees shall be eligible to participate in the Welfare Fund, provided there are at least eight (8) weeks in the calendar quarter in which they are hired/promoted to full-time. If not, participation in and contributions to such Welfare Fund shall commence as of the first day of the following calendar quarter.

2. **All Other Employees.**

All other employees shall not be covered by the Welfare Fund. All such individuals and their dependents shall be covered by the Employer's medical, dental, eye care/optical plan. A summary of such benefits shall be provided to each employee upon his/her successful completion of the probationary period.

B. Contributions shall be made to the Welfare Fund on or before the tenth (10th) day of the succeeding month on account of contributions due for the immediately preceding month.

C. In the event there are any revisions to the eligibility requirements for participation in the Local 295/851 Welfare Fund, the parties shall meet and discuss such changes.

D. The Employer assumes full responsibility for coverage for all employees and in the event of any loss sustained by the employee or his family resulting from the negligence or failure of the Employer to make regular and timely contributions to the Fund, the Employer shall personally be liable for any such loss. The Employer further agrees to provide statutory disability benefits for the employees covered by this Agreement at no cost to the employees covered by this Agreement.

E. Payments to Welfare Fund shall not be continued during a strike.

F. The parties hereby confirm and approve the composition and membership of the Board of Trustees of the Health & Welfare Fund as now and hereafter constituted.

G. A duly authorized agent or representative of the Employer is to acknowledge the accuracy and to verify the contributions by affixing his

44

45

CONFIDENTIAL

DHL 27