MICHAEL G. O'NEILL
(MO3957)
Attorney for Plaintiff
30 Vesey Street
New York, New York 10007
(212) 581-0990

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------

**Dino Paladino,**

               **Plaintiff**,

   -          **against -**

**DHL Express (USA), Inc. and International**
**Brotherhood of Teamsters Air Freight Chauffers,**
**Handlers, Warehousemen & Allied Workers**
**Union No. 295,**

  **Defendants.**

-----------------------------------------------------------------

            **07 Civ. 1579 (DRH-ARL)**

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

# Table of Contents

Table of Contents ................................................................................................................ 2

Table of Authorities .......................................................................................................... 3

Preliminary Statement ....................................................................................................... 4

Preliminary Statement ....................................................................................................... 4

Facts ................................................................................................................................... 4

   Plaintiff's History at DHL 1985 – 2002 ....................................................................... 4

   Plaintiff's History at Station Islip (Diagnosis of Celiac Disease and Clinical Depression) 2002-2005 ........................................................................................................................... 5

   The January 2006 "Last Chance" Incident ................................................................... 7

   The Three October 9, 2006 Gaps .................................................................................. 8

   Plaintiff's Termination ................................................................................................ 10

   The Cursory Union Investigation ............................................................................... 12

   The Aftermath of the Termination of Plaintiff's Employment ................................... 12

   DHL's Outrageous Discovery Tactics ........................................................................ 13

Argument .......................................................................................................................... 14

   Applicable Law ........................................................................................................... 14

   1.   There Are Genuine Issues of Material Fact for Trial Regarding Plaintiff's Claim of Disability Discrimination Under New York State Executive Law § 296 ................................ 15

      A.   DHL Violated Executive Law § 296 by Failing to Provide Plaintiff With Reasonable Accommodations Upon Notice of Plaintiff's Disabilities .................................... 15

      B.   Plaintiff has a Prima Facie Case of Disability Discrimination Under New York State Law 19

      DHL Makes No Showing of a Legitimate Nondiscriminatory Reason for the Termination of Plaintiff's Employment or that Plaintiff's Disabilities Prevented Him from Performing his Job in a Reasonable Manner. ........................................................................................... 19

   2. There Are Genuine Issues of Material Fact for Trial Regarding Plaintiff's Claim That  Local 295 Breached its Duty of Fair Representation to Plaintiff....................................................... 24

Conclusion ....................................................................................................................... 26

# Table of Authorities

## Cases

*Antonsen v. Ward*, 77 N.Y.2d 506, 571 N.E.2d 636, N.Y. (1991) ............................... 18

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986) ................................... 14

*Cleargeau v. Local 1181, Amalgamated Transit Union, AFL-CIO*, 162 Fed. Appx. 32, 2005 WL 3579358, C.A.2. (N.Y.) ........................................................................................ 25

*D'Avilar v. Cerebral Palsy Assoc. of New York*, 848 N.Y.S.2d 809, N.Y. 2007 ....................... 17

*De Arroyo v. Sindicato de Trabajadores Packinghouse, AFL-CIO,* 425 F.2d 281 (1st Cir.), *cert. denied,* 400 U.S. 877, 91 S.Ct. 121 (1970) ..................................................... 24

*Donahue v. Windsor Locks Brotherhood. of Fire Commissioners*, 834 F.2d 54 (2d Cir. 1987) .. 15

*Emmanuel v. International Broth. of Teamsters, Local Union No. 25*, 426 F.3d 416 C.A.1 (Mass.) 2005 ......................................................................................................... 25

*Fandino v. Secretary of Dept. of Health and Human Services*, 1987 WL 16150 (S.D.N.Y. 1987) ............................................................................................................................. 18

*Felix v. New York City Transit Authority*, 154 F.Supp.2d 640 (S.D.N.Y. 2001) .................. 16, 17

*Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219 (2d Cir. 1994) ............. 14

*Hayes v. Estee Lauder Inc.*, 34 A.D.3d 735 (2nd Dept. 2006) ...................................... 17

*King v. Wallkill* 302 F.Supp2d 279 (S.D.N.Y. 2004) ................................................. 15

*Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 119 S.Ct. 292 (1998) ....................... 24

*Niemczura v. Coral Graphics Services, Inc.* 04-CV-5452, 2005 WL 3113424 (E.D.N.Y. 2005) 16

*NLRB v. Local 282, Interational Brotherhood of Teamsters,* 740 F.2d 141 (2d Cir.1984)......... 25

*Parker v. Columbia Pictures Indus.*, 204 F3d 326 (2nd Cir. 2000) ................................ 17

*Pimentel v. Citibank, N.A.*, 29 AD3d 141 (1st Dept. 2006)................................... 17, 19

*Romanello v. Shiseido Cosmetics America Ltd.* 2002 WL 31190169 (S.D.N.Y.)..................... 15

*Simmons v. New York City Transit Authority*, 20008 WL 2788755 (E.D.N.Y.) .................. 17, 18

*Stola v. Joint Industrial Board*, 889 F.Supp. 133 (S.D.N.Y. 1995).................................. 17

*Tully-Boone v. North Shore-Long Island Jewish Hosp. System,* 588 F.Supp.2d 419 (E.D.N.Y. 2008) .......................................................................................................... 19

*Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903 (1967) ............................................... 24, 25

*Wisneski v. Nassau Health Care Corp.* 296 F.Supp.2d 367 (E.D.N.Y. 2003) ...................... 15

Statutes
29 U.S.C. § 158....................................................................................................... 24
N.Y. Executive Law § 296........................................................................... 15, 18, 19

## Preliminary Statement

This Memorandum of Law is submitted in opposition to the motions for summary judgment submitted individually by defendant DHL ("DHL") and defendant Local 295 ("Local 295").   As set forth below, the DHL and the Local 295 motions for summary judgment should be denied.  The defendants have failed to demonstrate an absence of genuine issues of triable fact for the claims raised by plaintiff.

The termination of plaintiff's employment by DHL for allegedly committing "theft of company time" on October 9, 2006 violates both the New York State Executive Law as well as the terms of the collective bargaining agreement governing plaintiff's employment by DHL.  The refusal by Local 295 to arbitrate this termination violates its duty of fair representation owed to plaintiff.

## Facts

### Plaintiff's History at DHL 1985 – 2002

DHL is in the package delivery business.  Plaintiff was employed by DHL and its predecessor company (hereinafter collectively "DHL") since 1985.  Decl. Paladino ¶ 1; Paladino Dep. at 105:16-25, 106-125, 126:1-7.  In his twenty-one years of service plaintiff has worked at several DHL facilities.  He served as a bike messenger for the Murray St. Station and the Long Island City Station in 1985, and he was subsequently a truck driver for the Hicksville (which became the Westbury) and Farmingdale stations. *Id.*  In 2001, while at Farmingdale Station, plaintiff experienced a series of familial and medical difficulties that prompted him to request a hardship transfer to the Islip station.  From 2002 until his termination in 2006 plaintiff was

4

stationed in Islip. Decl. Paladino ¶ 4; Paladino Dep. at 128:12-25, 129-133.  While working from the Islip station, plaintiff's regular shift was from 4:00 a.m. to 1:00 p.m. *Id.*

### Plaintiff's History at Station Islip (Diagnosis of Celiac Disease and Clinical Depression) 2002-2005

In 2002, plaintiff was diagnosed with clinical depression and began taking Effexor and Welbutrin1 under the care of Dr. Greene.  Decl. Paladino ¶ 5; Paladino Dep. at 81:2-8, 100:11-25, 101:1-20, 551:13-25, 552-554, 555:1-23.   Plaintiff often expressed to coworkers, supervisors and union officials the effect his clinical depression had upon his work performance. He experienced anxiety attacks, fatigue, decreased energy levels, weight gain and feelings of malaise. Decl. Paladino ¶ 5; Kollef Decl. Exhibit B.  Paladino Dep. at 32, 33:1-10, 311:9-25, 312:1-9, 530:21-25, 531, 532 and 533:1-11; Decl. Paladino ¶ 5; Bruno 30(b)(6) Dep. at 61:9-14, 62:12-25, 63:1-8, 121:24-25, 122:1-10; Sidorski 30(b)(6) Dep. at 79:4-5.

In 2002 plaintiff was also diagnosed with Celiac disease by Dr. Greene, who treated plaintiff with dietary restrictions.  Decl. Paladino ¶ 6;  Paladino Dep. at 71:18-25, 72:1-7, 73:25, 74-79, 80:1-12, 374:5-19, 375:10-14, 545  546:1-11.  Celiac disease is a digestive condition, without cure, in which the gluten protein in wheat damages the small intestine, leading to the malabsorption of nutrients. MayoClinic.com, *Celiac Disease* (Dec. 13, 2008) (available at http://www.mayoclinic.com/health/celiac-disease/DS00319).  Those who suffer from this disease, including plaintiff, experience abdominal pain, bloating, cramps, intermittent diarrhea, depression and general weakness and fatigue. *Id.* at *Symptoms*.  Even a trace amount of gluten can onset symptoms and complications, and contamination can occur whenever gluten-free products are prepared alongside food containing gluten. *Id.* at *Treatment and Drugs*.

---

1 Effexor and Welbutrin are listed as anti-depressant medications by the National Institute of Mental Health.  Kollef Decl. Exibit A.

5

Plaintiff's debilitating condition was well-known among supervisors and co-workers during his four years at Islip Station, although he did not explicitly identify himself as having Celiac disease.  Decl. Paladino ¶ 6;  Paladino Dep. at 71:18-25, 72:1-7, 73:25, 74-79, 80:1-12, 374:5-19, 375:10-14, 545  546:1-11.  He experienced recurring diarrhea and constipation lasting for days or months, resulting in observable fatigue, decreased energy and weakness. *Id.*   As a necessity, plaintiff spent long periods of time in the bathroom while on the road or in the station. *Id.*  Supervisors would sometimes check the bathroom, send employees to check the bathroom or page plaintiff during his episodes of gastrointestinal distress.  Plaintiff repeatedly explained to supervisors, including Sidorski, the reasons for his detention in the men's room. Decl. Paladino ¶ 6.

From 2002 to 2003 plaintiff's familial and medical problems intensified.  In addition to discussing the effects of his Celiac condition, he conversed with Station manager Sidorski, Local 295 Recording Secretary/Business Agent Vinnie Bruno ("Bruno") and Shop Steward Paul Blasucci ("Blasucci") about his increasingly debilitating depression. Decl. Paladino ¶ 8; Bruno 30(b)(6) Dep. at 61:9-14, 62:12-25, 63:1-8.

In 2004 plaintiff was taken from work by ambulance to Brookhaven Hospital after he suffered a severe anxiety attack.  Paladino Dep. at 306:23-25, 307-309, 310:1-7; Decl. Paladino ¶ 9.  When plaintiff recovered and returned to work, he had a long discussion with Sidorski regarding this incident. *Id.*  Sidorski suggested that plaintiff "should see someone about that," meaning plaintiff's depression. Plaintiff informed Sidorski that he was seeing a doctor for treatment and taking antidepressant medication. *Id.*

On January 18, 2005 plaintiff was observed sleeping in his truck by a manager. Decl. Paladino ¶ 10.  Plaintiff discussed this incident, and his struggle with fatigue, in detail with

Sidorski.  *Id.;* Goodstadt Decl Exhibit. C at 73-74 and Exhibit. Q; Sidorski *30*(b)(6) Dep. at 74:22-25, 75, 76:1-5.

On three different occasions, occurring in April, August and November of 2005, plaintiff was disciplined up to Step VI  in the attendance/lateness discipline procedure under the collective bargaining agreement.  Decl. Paladino ¶ 11; Goodstadt Decl. Exhibits N, O & P.  At Step VI, an employee may be discharged for carless or neglectful conduct.  Throughout these disciplinary processes, plaintiff informed the managers, supervisors and union officials involved, including Sidorski and Blasucci, that his attendance and lateness issues were the result of his medical problems.2  Decl. Paladino ¶ 11.

### The January 2006 "Last Chance" Incident

On January 4, 2006 plaintiff worked his regular 4:00 a.m. to 1:00 p.m. shift.  Plaintiff completed two round trips to JFK Airport on the morning of January 4, 2008.  He was then without a specific assignment; during the ensuing down time cashed his paycheck.3  On the way back from the bank plaintiff, who was not feeling well, pulled over to buy aspirin and fell asleep. He was then seen by a passing supervisor.  Decl. Paladino ¶ 13; Paladino Dep. at 280:11-14, 282:21-24, 284:13-18, 290, 291:1-17,  320:9-19.

Before being disciplined, plaintiff described the events to Sidorski and repeated that he was taking medication for depression and struggling with medical issues.  Decl. Paladino ¶ 14; and Paladino Dep. at 224:9-25, 225-226, 227:1-17, 324:14-25, 325, 326:1-22.  Sidorski's

2 In late 2005 or early 2006 plaintiff was prescribed Cymbalta, another anti-depressant medication, to replace Effexor and Welbutrin.  Decl. Paladino ¶ 12; Paladino Dep. at 533:15-25, 534:1-4, 557:15-25, 558:1-12, 574:8-18; Kollef Decl Exhibit A .  Throughout the year, plaintiff continued to receive treatment for depression and Celiac disease.  Decl. Paladino ¶ 12; and Paladino Dep. at 81:2-8, 100:11-25, 101:1-20, 551:13-25, 552-554 and 555:1-23.
3 Allowing employees to deposit their paychecks during their shift is an accepted practice at DHL.  Decl. Paladino ¶ 13; Paladino Dep. at 287:1-12.

responded that plaintiff should get some help. *Id.*  Plaintiff similarly raised these issues with both Blasucci and Bruno in discussing this incident.   Local 295 was also made aware that plaintiff had been feeling ill and fatigued, and had fallen asleep in the truck after pulling over to buy aspirin.  Decl. Paladino ¶ 14; Paladino Dep. at 222:6-25, 223, 224:1-8; Bruno 30(b)(6) Dep. at 98:6-25, 99:1-11.

The union grieved the termination, and negotiated a settlement with DHL.  This discipline was reduced to a time served suspension and plaintiff was issued a "Last Chance" letter.  Decl. Paladino ¶ 15.  A  Last Chance letter is a document promulgated by DHL, as part of the settlement of a grievance, putting the employee on notice that if he or she commits a "like kind" offense in the future DHL will terminate their employment.  Bruno 30(b)(6) Dep. at 101:10-25, 102, 103:1-9.

During the balance of 2006 plaintiff continued to suffer from Celiac disease and depression and to discuss these difficulties with Local 295, supervisors and managers, including Sidorski, Blasucci and supervisor Rocco Russo.  Kollef Decl. Exhibit H; Paladino Dep. at 232-247, 248:1-20, 363:23-25, 364:1-22, 560:20-25, 561-563, 564:1-22; Decl. Paladino ¶ 16.

### The Three October 9, 2006 Gaps

October 9, 2006 was a holiday, Columbus Day, and plaintiff worked a double shift: his regular shift from 4:00 a.m. to 1:00 p.m. and an additional shift from 1:00 p.m. to 7:00 p.m. Paladino Dep. at 366:17-25, 367-368, 3691-13; Decl. Paladino ¶ 17.  During his first shift, plaintiff was in the bathroom from approximately 10:44 until 11:49 a.m. with gastrointestinal upset caused by his Celiac disease.  Paladino Dep. at 371:9-25, 372:1-9, 373:6-23, 416:12-24, 514:15-24; Decl. Paladino ¶ 17; Bruno 30(b)(6) Dep. at 64:5-21; Goodstadt Decl. Exhibits BB, DD, FF.  He then delivered packages from at 12:05, 12:11 and 12:26. Goodstadt Decl. Exhibit

DD.  In between shifts, from approximately 12:33 to 12:58 p.m. plaintiff returned to the station as per the direction Supervisor Garcia. Goodstadt Decl. Exhibits BB, DD, FF; Decl. Paladino ¶ 17; Paladino Dep. at 15:22, 416:25, 417:1-14.

Plaintiff told supervisor Mike Garcia ("Garcia") and Dispatcher Zebro that he had been ill in the bathroom for approximately an hour that morning.  Garcia pleaded with plaintiff to work the second shift despite being sick because the station was shorthanded. Paladino Dep. at 369:4-10, 373:6-16, 463:21-25, 465:6-25, 466, 467:1-11; Decl. Paladino ¶ 17.  Garcia stressed that there would not be much work that day because of the Columbus Day holiday and that plaintiff's assignments to pick up packages would not start until later in the afternoon.4  Decl. Paladino ¶ 17; Goodstadt Decl. Exhibits BB, DD, FF.  Despite not feeling well, plaintiff agreed to work the second shift to avoid leaving his employer shorthanded.  Paladino Dep. at 369:4-10, 373:6-16; Decl. Paladino ¶ 17.

Anticipating the lack of work, Garcia directed plaintiff to contact driver Jimmy Smith ("Smith") to see if he needed help with his route.  Plaintiff and Smith exchanged several messages, in which plaintiff offered assistance and Smith declined, as evident in records provided by the defendants.  The last exchange between plaintiff and Smith took place at 1:20 p.m. See Exhibit CC.  Plaintiff proceeded to the area near his own route and waited to perform afternoon pickups, as directed by Garcia. Goodstadt Decl. Exhibits BB, CC, DD, FF; Sidorski 30(b)(6) Dep. at 71:8-25, 72:1-11.

From 1:20 to 3:11 p.m. Plaintiff spent about 45 minutes of his downtime cleaning his truck.  This is an activity the company encouraged by the company that involves the removal of

---

4 The normal practice for "pickups" is to perform them at the end of the time window set to pick them up.  Paladino Dep. at 425:3-15, 426:6-14, 427:5-12, 446:25, 447-448, 449:1-23; Paladino Decl.¶ 17.

dirt, but especially the reorganizing of all of the labels, stickers, airmail bills and envelopes that are stored in the truck in a "rack" system. Paladino Decl. ¶ 18.  He also found himself exhausted, alone and still recovering from an earlier gastrointestinal episode.  Plaintiff experienced what he describes as an "emotional breakdown."   For a period of approximately 45 minutes, he suffered from an intense wave of irritability, despair, anger and weeping.  He felt nearly suicidal and completely consumed with sorrow.  Paladino Decl. ¶ 18.

Plaintiff believes that his emotional breakdown was the result of an adverse reaction to his medication, Cymbalta.  Although he has been on Cymbalta for several months, he was increasingly unsure that the medication was a good match for his depression.  Under his doctor's direction, he stopped taking Cymbalta after his terminated because it was so difficult for him to control his emotions on this particular medication.  *Id.*

Plaintiff was careful to pull himself together before moving on, for fear someone would recognize his emotional state. Decl. Paladino ¶ 18.  At 3:04 p.m. he received a radio transmission directing him to a pick up that needed to be completed by 3:15; at 3:11 plaintiff completed this pick up. Paladino Dep. at 387:18-25, 388:1-19, 491:11-25 and 492:1-21; Decl. Paladino ¶ 18; Bruno 30(b)(6) Dep. at 64:5-25, 65:1-3.

### *Plaintiff's Termination*

On October 10, 2009, plaintiff was informed that he was being investigated for "theft of company time" for the three periods or "gaps" when he wasn't delivering packages on October 9, 2006. Decl. Paladino ¶ 19.  Plaintiff discussed the charges with supervisor John Wallace ("Wallace") that he was feeling ill that day.  Wallace informed Sidorski and manager Carlos Arostegui ("Arostegui") of this discussion. *Id.;* Goodstadt Decl. Exhibit AA.   Plaintiff also met with shop steward Paul Blasucci ("Blasucci"), supervisor Russo and manager Arostegui to

discuss his performance on October 9, 2006.  Decl. Paladino ¶ 19; Goodstadt Decl. Exhibits DD, EE.

Sidorski held a meeting with plaintiff, shop steward Blasucci and Arostegui before deciding to terminate plaintiff's employment.  Sidorski 30(b)(6) Dep. at 58:5-17; Decl. Paladino ¶ 20.  Plaintiff was notified on October 11, 2006 that he was fired for committing theft of company time on October 9, 2006, and that a hearing would take place regarding his termination. Goodstadt Decl. Exhibit GG; and Decl. Paladino ¶ 20.  On October 13, 2006 in a pro forma "Step II" grievance review for reinstatement, Sidorski denied the grievance. Goodstadt Decl. Exhibit HH; Decl. Paladino ¶ 20.

As a matter of policy, Local 295 does not advance grievances to Step III unless they are meritorious. Bruno 30(b)(6) Dep. at 34:22-25.  On October 19, 2006, a Step III meeting was held with plaintiff, Bruno, Sheedy and Sidorski present.  Decl. Paladino ¶ 21; Bruno 30(b)(6) Dep. at 80:14-25, 82-83 and 84:1-4; Goodstadt Decl. Exhibit II.  The participants discussed plaintiff's explanation of his periods of inactivity on October 9, 2009. In doing so, they explicitly discussed plaintiff's Celiac disease, diagnosed depression, apparent family troubles, and medical treatment. Bruno 30(b)(6) Dep. at 80:14-25, 82-83, 84:1-4; Decl. Paladino ¶ 21; Paladino Dep. at 530:21-25, 531, 532:1-11, 533:15-25.   Nevertheless, DHL refused to rescind the termination. *Id.;* Goodstadt Decl. Exhibit II.

At the Step III meeting, plaintiff requested an accommodation based on his emotional and medical problems. Kollef Decl. Exhibit G; Bruno 30(b)(6) Dep. at 80:14-25, 82-83, 84:1-4; Decl. Paladino ¶ 21; Paladino Dep. at 530:21-25, 531, 532:1-11, 533:15-25.  DHL denied his request for an accommodation, and his position was not reinstated. Decl. Paladino ¶ 21; Bruno 30(b)(6) Dep. at 80:14-25, 82-83, 84:1-4; Goodstadt Decl. Exhibit II.

### *The Cursory Union Investigation*

Local 295 conducted an inadequate investigation into plaintiff's job performance on October 9, 2006.  Local 295 does not have any set policies or guidelines established for conducting an investigation. Bruno 30(b)(6) Dep. at 38:9-12.  Local 295's cursory investigation of plaintiff's termination determined that plaintiff was terminated for two gaps on October 9, 2008 (Bruno Decl. ¶ 22) and that "Based on the length of time of these two gaps and the fact that Mr. Paladino failed to both pick up and deliver packages during the period he was required to, it appeared that DHL had a very strong case against Mr. Paladino."  Bruno Decl. ¶ 23.

Local 295 reached this conclusion without any investigation as to what degree gaps normally occurred, the length of those gaps and to what extent DHL disciplined employees for gaps of unaccounted time.  Such gaps were commonplace at the Islip station (see detailed gap analysis in O'Neill Decl. ¶¶ 24-31) and were inevitably even more pronounced on the October 9, 2006 because it was Columbus Day Holiday.

The Local 295 Board met on October 24, 2006 to determine whether to proceed to arbitration. Kollef Decl. Exhibit I.  Bruno made a verbal report without any exhibits, describing the 65 minute morning gap, the 124 minute afternoon gap, plaintiff's emotional and physical difficulties that day and the "Last Chance" letter. Bruno 30(b)(6) Dep. at 87-89, 90:1-13.  The board did not move plaintiff's termination forward to arbitration. Potentially, out of concern that DHL would retaliate by refusing to enter into any further "Last Chance" settlements with the union. Bruno 30(b)(6) Dep. at 114:14-25, 115:1-14.  Plaintiff subsequently brought this action.

### *The Aftermath of the Termination of Plaintiff's Employment*

The medical and familial difficulties faced by plaintiff have been greatly exacerbated by the wrongful termination of his employment by DHL.  Plaintiff declared bankruptcy in 2007 and

lost his home to foreclosure in early 2008. Paladino Dep. at 40-41, 42:1-24, 47:12-25, 48:1-10 and 637:1-15; and Decl. Paladino ¶ 22.  He lost his health coverage in 2007, and he subsequently stopped receiving professional treating for his depression resulting in a suicide attempt and three hospitalizations for depression between 2008 and 2009.  Paladino Dep. at 637:16-25, 638:1-3; Decl. Paladino ¶ 22.

### DHL's Outrageous Discovery Tactics

Plaintiff served initial discovery demands on DHL on February 13, 2008, including demands to identify and produce all reports by DHL regarding gaps of lost time by drivers at the Islip station. Kollef Decl. Exhibit J.  In its responses to plaintiff's demands, DHL failed to provide basic discovery to plaintiff, including any information gap-related information. *Plaintiff's motion to compel basic discovery from defendant DHL*, Docket No. 21.  In response, plaintiff filed a motion dated May 16, 2008 seeking to compel discovery from DHL. *Id.*  A discovery order was issued by Judge Lindsay on July 8, 2008. Kollef Decl.Exhibit K.

In response to Judge Lindsay's order and plaintiff's demands for DHL reports on time gaps for drivers at the Islip station, DHL provided plaintiff with fourteen file boxes containing approximately 48,000 pages of individual manifests of drivers at Islip Station from June to December 2006. *Id.* at ¶ 13.  Not included in the 48,000 pages produced by DHL were the manifests for October 9, 2006, the date with the gaps for which plaintiff was terminated. *Id.*

In preparing an analysis of the gap information from these manifests for its opposition to summary judgment, plaintiff asked DHL whether this omission was deliberate. *Id.* at Exhibit L. DHL responded that the missing October 9, 2006 manifests were not in DHL's possession, custody or control.  For plaintiffs to extrapolate meaningful information from the 48,000 pages containing gap data, these pages had to be individually examined, requiring approximately one

hundred hours of attorney time. *Id.* at ¶ 17.  By providing the gap information in this format,

DHL offered plaintiff the least accessible and most difficult access to the materials, inundating

plaintiff with a sea of documents at prohibitive cost in time and resources.

On March 5, 2009, almost three months after close of fact discovery, DHL provided

plaintiff with gap information for October 9, 2006. DHL also provided plaintiff with a "Gap

Report" for containing a summary of the gaps for each Islip driver on October 9, 2006, including

the total number of gaps and total gap time.  *Id.* at Exhibits M and N.   It should be noted that the

said 48,000 pages of individual driver manifests produced by DHL comprised only six months or

25% of the two years worth of gap information DHL should have provided pursuant to Judge

Lindsay's order. *Id.* at Exhibit K.

## Argument

### *Applicable Law*

The rules governing summary judgment are well known, and only a brief overview is

necessary.  Such relief may be granted only when the movant carries its burden of demonstrating

there are not any genuine issues of material fact for trial, and that it is entitled to judgment as a

matter of law. Fed. R. Civ. P. 56(c). See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.

Ct. 2548 (1986).  No genuine issue exists if, on the basis of all the pleadings, affidavits and other

papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-

movant, it appears that the evidence supporting the non-movant's case is so scant that a rational

jury could not find in its favor. See *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22

F.3d 1219, 1224 (2d Cir. 1994).

In considering a motion for summary judgment, the Court is not to resolve contested

issues of fact, but rather is to determine whether there exists any disputed issue of material fact.

14

See, e.g., *Donahue v. Windsor Locks Brotherhood. of Fire Commissioners*, 834 F.2d 54, 58 (2d Cir. 1987).  Such genuine disputes of material fact exist for each of the claims raised by plaintiff in his pleadings. Defendants motion should be denied.

1.   ***There Are Genuine Issues of Material Fact for Trial Regarding Plaintiff's Claim of Disability Discrimination Under New York State Executive Law § 296***

   A.   **DHL Violated Executive Law § 296 by Failing to Provide Plaintiff With Reasonable Accommodations Upon Notice of Plaintiff's Disabilities**

An employer is required to provide reasonable accommodations for the known disabilities of an employee. N.Y. Executive Law § 296(3)(a).  To establish a prima facie case of disability discrimination based on Executive Law § 296, plaintiff must show that (1) the employee was an individual who had a disability within the meaning of the law, (2) the employer had notice of the disability, (3) with reasonable accommodation the employee could perform the essential functions of the position, and (4) the employer refused to make such accommodations. *Romanello v. Shiseido Cosmetics America Ltd.* 2002 WL 31190169 (S.D.N.Y.). See also *King v. Wallkill* 302 F.Supp2d 279 (S.D.N.Y. 2004); *Wisneski v. Nassau Health Care Corp*. 296 F.Supp2d 367 (E.D.N.Y. 2003).

***Plaintiff is disabled within the meaning of New York Executive Law § 296***

Plaintiff is unmistakably disabled within the meaning of the statute.  Disability, for the purposes of N.Y. Executive Law § 296, means:

> (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic  techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to

15

> disabilities which, upon the provision of reasonable accommodations, do not
> prevent the complainant from performing in a reasonable manner the activities
> involved in the job or occupation sought or held.

*Id.* adopting definition from N.Y. Executive § 292, Sect 21.

As the record plainly indicates, plaintiff's diagnosed Celiac disease and depression prevent him

from exercising normal bodily functions, including; sleeping, eating and using the restroom

voluntarily, without pain and lingering discomfort.  DHL does not dispute plaintiffs diagnosis or

the severity of his symptoms.

### *DHL had notice of plaintiff's disabilities and refused plaintiff any accommodations*

On at least three occasions plaintiff requested that DHL consider his disabilities when

evaluating his performance: in 2005, during attendance disciplines; in January 2006, regarding

the "Last Chance" discipline; and at the October 2006 Step Three review.  The record repeatedly

shows that Plaintiffs life-altering depression and debilitating gastrointestinal problems, caused by

Celiac disease, were apparent to Sidorski, Bruno and Blasucci, among others.  Finally, it is

uncontested that DHL was aware of plaintiff's disabilities by October 19, 2006, the day of the

Step III meeting.   Sidorski Dep. at 69:12-25, Goodstadt Decl. Exhibit C; Bruno Dep. at 81:3-

82:23, Goodstadt Decl. Exhibit E.

An employee is not under an initial burden to request an accommodation "where the

disability is obvious or otherwise known to the employer without notice from the employee."

*Felix v. New York City Transit Authority*, 154 F.Supp.2d 640, 657 (S.D.N.Y. 2001); see also,

*Niemczura v. Coral Graphics Services, Inc.* 04-CV-5452, 2005 WL 3113424 at *5 (E.D.N.Y.

2005).

Even if it is determined that DHL was unaware of plaintiff's disabilities until after the events of October 9, 2006, this would not excuse DHL from an obligation to work with plaintiff to accommodate plaintiff's disabilities rather than terminate his employment.  In *Simmons v. New York City Transit Authority*, 20008 WL 2788755 (E.D.N.Y.), defendant was found to have discriminated against a train driver who was suffering from such intense Irritable Bowel Syndrome that she, like the plaintiff in this case, was occasionally forced to spend hours in the bathroom while on the job.  Ms. Simmons did not ask for an accommodation until the Transit Authority instigated an adverse action against her.  The jury determined, and the court upheld, that the "plaintiff's request for an accommodation at the reclassification examination was timely." *Id.* at *5.

Repeatedly New York Courts have held that "The employer has the responsibility to investigate an employee's request for an accommodation and determine its feasibility." (*D'Avilar v. Cerebral Palsy Assoc. of New York*, 848 N.Y.S.2d 809, N.Y. 2007, quoting *Pimentel v. Citibank, N.A.*, 29 AD3d 141, 149 (1st Dept. 2006)).  Further, "Disability discrimination statutes, whether federal or state, envisage employer and employee engaged in an interactive process in arriving at a reasonable accommodation and determin[ing] a reasonable accommodation for a disabled employee." *Parker v. Columbia Pictures Indus.,* 204 F3d 326, 328 (2nd Cir. 2000). See also, *Felix,* 154 F.Supp.2d at 656-57; *Stola v. Joint Industrial Board*, 889 F.Supp. 133, 135 (S.D.N.Y. 1995)).

An employer can be held liable solely on its failure to move forward with this process. *Hayes v. Estee Lauder Inc.*, 34 A.D.3d 735, 737 (2nd Dept. 2006).  There is no evidence to suggest that DHL even considered this obligation.  Instead, supervisors ignored plaintiff's repeated concerns about the effect his disabilities had on his work performance, during his four

years at the Islip station.  Thus, DHL failed in its duty to engage in an interactive process with plaintiff to pursue a reasonable accommodation even though plaintiff had repeatedly placed his employer on notice of his disabilities.  Clearly, the question of when DHL was on notice as to plaintiff's disabilities is a genuine issue of material fact for trial.

### Plaintiff can perform the essential functions of a DHL driver with reasonable accommodations

It is unlawful for an employer to refuse to make reasonable modifications in policies, practices or procedures to accommodate an individual with disabilities. N.Y. Executive Law § 296 (c)(i).  Courts are assisted in determining when an accommodation is "readily achievable" or "easily accomplished without much difficulty or expense" by criteria provided in the statute itself, including; the cost of the accommodation, the overall financial resources of the company, equipment required and any undue burden. *Id.* at (2)(d).  A company with the vast resources and employee-force of DHL, must surely be aware of its duty (similar under state and federal law) to provide reasonable accommodations for disabled employees.

The question of whether plaintiff's condition can be accommodated without preventing plaintiff from performing his position in a reasonable manner, is a question of fact left largely unexplored because of DHL's refusal to consider accommodations altogether.  However, Celiac disease and other conditions seriously impairing an employee's bowels are often upheld as disabilities by New York Courts.  See, e.g., *Simmons v. New York City Transit Authority*, 20008 WL 2788755 (E.D.N.Y. 2008); *Antonsen v. Ward*, 77 N.Y.2d 506, 571 N.E.2d 636, N.Y. (1991); *Fandino v. Secretary of Dept. of Health and Human Services*, 1987 WL 16150 (S.D.N.Y. 1987).

Depression is also widely-held as a disability within the meaning of the statute.  In *Tully-Boone v. North Shore-Long Island Jewish Hosp. System,* (588 F.Supp.2d 419, 425-426

(E.D.N.Y. 2008)), a depression diagnosis was sufficient to trigger reasonable an accommodation analysis by the court under New York Human Rights Law.  See also, *Pimentel v. Citibank N.A.*, 29 A.D.3d 141, 145, N.Y.A.D. (1st Dept., 2006) (where the issue of depression as an impairment under New York Law was not even contested by the parties).

> **B.     Plaintiff has a Prima Facie Case of Disability Discrimination Under New York State Law**

It is an unlawful discrim  inatory practice for an empl  oyer to discharge an em  ployee because of their di sability. N.Y. Executive  Law § 296 (1)(a).  The Ne  w York State Court of Appeals has held that a "com     plainant states   a pri ma fa cie ca se of di  scrimination i f the individual suffers from   a disability and the      disability caused the be  havior for which the individual was te rminated." *Matter of McEniry v . Landi,*  84 N.Y.2d 554, 558, 620 N.Y.S.2d 328, 330 (1994).

In the facts before this court, as discussed in detail above, plaintiff has been diagnosed with two disabling conditions which meet the statutory definition of disabled, Celiac disease and depression.  An analysis of the events of October 9, 2006 will subsequently show with great clarity how the "gaps" in defendants time were either attributable to his disability or so routine in nature that the only conceivable conclusions is that plaintiff was singled out and terminated based on the stigma of his disabilities.

> **DHL Makes No Showing of a Legitimate Nondiscriminatory Reason for the Termination of Plaintiff's Employment or that Plaintiff's Disabilities Prevented Him from Performing his Job in a Reasonable Manner.**

Once a prima facie case is established, the burden of proof shifts to the employer to demonstrate that the disability prevented the employee from performing the duties of the job in a

reasonable manner or that the employee's termination was motivated by a legitimate

nondiscriminatory reason. *McEniry* at 558.

DHL has not demonstrated that plaintiff's disabilities prevented him from performing his

job in a reasonable manner. To the contrary, despite plaintiff's bathroom problems during the

morning gap on October 9, 2006, DHL asked him to continue to work the afternoon double shift.

Furthermore, despite plaintiff's emotional breakdown during the afternoon gap, he was still able

to complete the afternoon shift without any service failures. The reasonableness of the manner in

which plaintiff  performed his duties on October 9, 2006 is only reinforced by the fact that such

time gaps were an ordinary course of business at Station Islip.  See O'Neill Decl. ¶¶ 22-39.

Defendant asserts that it terminated plaintiff for the legitimate, non-discriminatory reason

of "theft of company time."  The so-called theft of time consisted of three "gaps" in plaintiff's

manifest, totaling approximately three and a half hours of time.  In order to evaluate this defense,

it is necessary to understand the factual record concerning "theft of company time," defendant's

records relating to manifest "gaps," and the evidence concerning defendant's practice with

respect to disciplining employees for theft of company time or excessive gaps.

Contrary to defendant's assertion that theft of company time is a "clearly defined"

category A terminable offense in the Collective Bargaining Agreement (hereinafter "CBA")

(Defendant's Memorandum, p. 19) it is in fact nowhere mentioned in the CBA, as a category A

offense or otherwise.  Plaintiff does not dispute that theft of time by an employee is a punishable

offense, but the point is that the CBA between the company and the union does not define the

offense.  Further, defendant introduces no evidence to show the Court how this offense has been

interpreted by the parties to the CBA.  Accidental or unintentional misuse of company time is not

theft of company time, nor is petty "goofing off."  Indeed, the CBA specifically provides that the

latter is a "Category C" offense, for which there is a four step progressive discipline procedure.5 CBA Appendix B, Section III(A.)(3).

Not surprisingly, the defendant has not shown the Court a single instance in which it disciplined, much less terminated, an employee under circumstances similar to the termination of the plaintiff herein.  During discovery, the defendant desperately resisted producing any discovery of disciplines of other employees for theft of company time or "gaps" in their manifests.  Plaintiff was required to obtain an order from the Magistrate Judge in order to obtain this information, and it is extremely revealing.  Defendant was ordered to produce all theft of time disciplines for a two-and-a-half year period of time, beginning in February 2004 and ending in October, 2006.  During this time, there were only six such disciplines in the entire region, not including the disciplines issued against plaintiff.  One of the six was actually retracted by defendant after investigation (it had nothing to do with theft of time). (Kollef Exhibit O, DHL 50052-61).  Of the remaining five, each of them dealt with incidents of intentional wrongdoing where the company could identify specific misconduct on the part of the employee:

- An employee named Yearwood admitted to manipulating his delivery manifest in order to create over four hours of overtime. (Kollef Exhibit O, DHL 50039-51). Yearwood received a suspension for his conduct;

- An employee named Pisicchio was disciplined for insubordination (refusing to complete his deliveries).  Subsequent investigation revealed large, unexplained gaps in his manifest and theft of time was added to the charge of discipline. Pisicchio received a suspension.  (Kollef Exhibit O, DHL 50062-66)

---

5        "Engaging in any activity unrelated to the proper performance of the employee's job duties and responsibilities, including but not limited to horseplay, gambling, loitering, ball playing, graffiti, etc.  Deadtime activity due to late planes or the time between deliveries and pickups will be subject to the local manager's discretion concerning the above." *Id*.

- A local business owner reported that several DHL delivery trucks were parked in the parking lot outside his business on a regular basis.  DHL conducted surveillance and determined that three employees, Fitanzo, Benedetti and Cameron, were regularly meeting for an unauthorized "coffee break" when they should have been working.  Employees received a suspension.  (Kollef Exhibit O, DHL 50067-86)

- A manager observed an employee who had just completed his probationary period named Niles working out of uniform and leaving his truck unlocked with the motor running.  Subsequent investigation revealed numerous other problems with employee's performance, including taking lunch off route, questionable time integrity, gap of 1 hour and questionable AD's (attempted deliveries).  (Kollef Exhibit O, DHL 50087-104)

- A employee named Quiroz admitted to manually entering his deliveries (as opposed to using the scanner) in order not to show gaps in his manifest.  These manipulations occurred in conjunction with the employee's lunch break and allowed the employee to take additional time off from work.  Quiroz was suspended.  (Kollef Exhibit O, DHL 50105-116)

Each of the foregoing disciplines involved acts of intentional wrongdoing in which the company could identify specific misbehavior on the part of the employee.  None of them was based solely on a so called "gap" in the employee's manifest, and none of them resulted in the final termination of the employees in question.

In this case, defendant has not identified any misconduct engaged in by plaintiff during time that he was supposed to be working.  Plaintiff has explained his activities during the three

gap periods, and defendant has not challenged those explanations or offered any evidence to call them into question.  Not only does the defendant not contest plaintiff's explanations of his activities, but it cannot, as plaintiff's account of his time is fully consistent with the record.  The first gap, which was from approximately 10:44 until 11:49 in the morning, was because plaintiff was in the bathroom as a result of his celiac disease induced gastrointestinal upset.  Defendant has not questioned this account or that celiac disease can create this type of symptom.

The second gap, which was from 12:33 to 12:58 in the afternoon, was because plaintiff had been instructed to return to the station.  This explanation is fully supported by defendant's own records, which show that at 11:50 and again at 11:52 a.m., plaintiff was instructed by dispatch to "return to the barn we need u to set up the back for out bound."

The third gap, from 1:09 to 3:13 in the afternoon, was occasioned chiefly by lack of work.  Plaintiff's account is that he was told first to offer to take over the route of a driver named Jimmy Smith.  Defendant's records show that plaintiff was in radio communication and offering to help Smith as late as 1:20 pm, but that Smith did not need help.  The next radio communication, at 3:04 p.m., was from dispatch informing plaintiff of a pickup that needed to be completed by 3:15.  Plaintiff reported at 3:11 that he had made the pickup.  Plaintiff accounts for the time between 1:20 and 3:11 p.m.by stating that he went to his pickup area to wait for work. He spent some time organizing his truck, and then he waited for work.  At this time he started dwelling on his family problems, and in his fragile state was overwhelmed with sadness and depression, which caused him to break down and weep for about 45 minutes.  Paladino Dep. at 387:18-25, 388:1-19, 491:11-25 and 492:1-21; Decl. Paladino ¶ 18; Bruno 30(b)(6) Dep. at 64:5-25, 65:1-3.

Defendant has not challenged this account or suggested that plaintiff was engaged in misconduct of any kind.  Ultimately, DHL's rationale for terminating plaintiff – theft of company time – amount to little more than a conclusory accusation.  DHL has not identified any misconduct or wrongdoing by the plaintiff, nor has it made any effort to explain what plaintiff should have been doing on Oct, 9, 2006.  In essence, DHL is stating that the gaps in plaintiff's manifest, without more, constitute something called theft of company time.  As the record shows, however, DHL has never terminated any other driver in the region during the period for which records were produced, for simply having gaps in his or her manifest, and nothing more.  The record also shows, unequivocally that large gaps are an everyday event and that plaintiff's afternoon gaps were representative of a frequent afternoon lull in activity for drivers on pickup routes.  In short, it is impossible to square DHL's explanation with the evidentiary record or with its treatment of other drivers at the station.  Defendants have therefore failed to establish a legitimate, nondiscriminatory reason for the termination of plaintiff's employment.

### 2. There Are Genuine Issues of Material Fact for Trial Regarding Plaintiff's Claim That  Local 295 Breached its Duty of Fair Representation to Plaintiff

The National Labor Relations Act imposes upon a union the responsibility to fully and fairly represent all of the employees in a bargaining unit. *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909 (1967); *De Arroyo v. Sindicato de Trabajadores Packinghouse, AFL-CIO,* 425 F.2d 281, 283-84 (1st Cir.), *cert. denied,* 400 U.S. 877, 91 S.Ct. 121 (1970). This duty requires unions "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca,* 386 U.S. at 177, 87 S.Ct. at 910. See also *Marquez v. Screen Actors Guild, Inc.,* 525 U.S. 33, 44, 119 S.Ct. 292 (1998).  Dereliction of this duty constitutes an unfair labor practice in

violation of § 8(b)(1)(A) of the Act, 29 U.S.C. § 158(b)(1)(A). See *NLRB v. Local 282,*
*International Brotherhood of Teamsters,* 740 F.2d 141, 145 (2d Cir.1984).

Local 295 breached its duty to plaintiff by failing to conduct a minimal investigation of
plaintiff's termination before refusing to engage in arbitration.  See *Cleargeau v. Local 1181,*
*Amalgamated Transit Union, AFL-CIO,* 162 Fed. Appx. 32, 2005 WL 3579358, C.A.2. (N.Y.)
citing *Emmanuel v. International Broth. of Teamsters, Local Union No. 25,* 426 F.3d 416 C.A.1
(Mass.) 2005.  In *Emmanuel* the court noted that the failure to interview key fact witnesses
would be arbitrary if those witnesses would have provided "beneficial information" that might
have altered the outcome of the union's decision. *Emmanuel* at 420.

The union's perfunctory review failed to include interviews with necessary witnesses,
namely; driver Smith, supervisor Garcia and dispatcher George Zebro, who could have verified
key aspects of plaintiff's account. Likewise, defendant failed to document its interviews with
plaintiff and did not consider any documents or evidence when its executive board convened and
decided to refuse to arbitrate plaintiff's termination.  The investigation was so cursory that it
didn't even identify and evaluate the three gaps for which plaintiff was terminated.  Clearly,
DHL failed to review any readily available information concerning plaintiffs termination, thus
failing to meet the obligatory standard of "complete good faith and honesty" and an avoidance of
arbitrary conduct. *Vaca,* 386 U.S. at 177, 87 S.Ct. at 910

The assertion in the declaration of Local 295 Agent Bruno that the union did not believe
that plaintiff's case could be won in arbitration is entitled to little weight.  The delivery and
pickup manifests and other "theft of company time" disciplines show unequivocally that DHL
did not terminate employees for having large gaps in their manifests generally, or for "theft of
company time" generally, without some evidence that the employee was engaged in intentional

25

wrongdoing.  The striking evidence that large gaps are an everyday event, that there is an identifiable pattern of large gaps for the slow pickup routes in the afternoon, and that plaintiff's afternoon gap fits this pattern and occurred on a federal holiday, all render it inconceivable that a labor arbitrator would terminate an employee with twenty-one years of seniority under these circumstances.  Local 295's refusal to take plaintiff's grievance to arbitration was a disgraceful failure on its part to represent a member who has been singled out for termination without cause.

## Conclusion

For the reasons set forth above, it is respectfully submitted that defendants' motions for summary judgment should be denied in their entirety.

Dated: New York, New York
        April 17, 2009

                                  MICHAEL G. O'NEILL
                                  (MO3957)


                                  _____
                                  Attorney for Plaintiff
                                  30 Vesey Street, Third Floor
                                  New York, New York 10007
                                  (212) 581-0990