UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

DINO PALADINO,

                Plaintiff,                              **MEMORANDUM AND ORDER**
                                                       07-CV-1579 (DRH) (ARL)

     -v.-

DHL EXPRESS (USA), INC. and INTERNATIONAL
BROTHERHOOD OF TEAMSTERS AIR FREIGHT
CHAUFFERS, HANDLERS, WAREHOUSEMEN
& ALLIED WORKERS UNION NO. 295,

                Defendants.
_____

**APPEARANCES:**

**For the Plaintiff:**
**Michael G. O'Neill**
30 Vesey Street
New York, N.Y. 10007

**For the Defendant DHL Express (USA), Inc:**
**Thompson Wigdor & Giley LLP**
85 Fifth Avenue
New York, N.Y. 10003
By: Andrew S. Goodstadt, Esq.
    Cindy E. Uh, Esq.

**For Defendant International Brotherhood of Teamsters Air Freight Chauffers, Handlers,
Warehousemen & Allied Workers Union No. 295:**
**Cary Lane LLP**
1350 Broadway, Suite 815
New York, N.Y. 10018
By: Joshua S.C. Parkhurst, Esq.

**HURLEY, Senior District Judge:**

                Plaintiff Dino Paladino ("Plaintiff") filed the present action against her former

employer, defendant DHL Express (USA), Inc. ("DHL"), and her union, defendant International

Brotherhood of Teamsters Air Freight Chauffers, Handlers, Warehousemen & Allied Workers

Union No. 295 ("Local 295") (collectively, "Defendants"), pursuant to § 301 of the Labor

Management Relations Act ("LMRA"), 29 U.S.C. § 185(a).  Plaintiff's "hybrid" action alleges

that DHL breached the collective bargaining agreement between DHL and Local 295 (the

"CBA") by terminating Plaintiff's employment without good cause and that Local 295's failure

to process Plaintiff's grievance through arbitration constitutes a breach of its duty of fair

representation.  Plaintiff also alleges that DHL unlawfully terminated his employment based

upon his disabilities in violation of the New York State Human Rights Law, N.Y. Exec. Law §

296 et seq. ("NYSHRL").  Defendants now move for summary judgment pursuant to Federal

Rule of Civil Procedure ("Rule") 56.  Defendant DHL also moves pursuant to Rule 56(e) to

strike the declaration of Michael G. O'Neill submitted by Plaintiff in support of his opposition to

DHL's summary judgment motion.  For reasons stated below, Defendants' motions for summary

judgment are granted; DHL's motion to strike is denied as moot.

## BACKGROUND

The material facts, drawn from the Complaint and the parties' Local 56.1

Statements, are undisputed unless otherwise noted.

### Plaintiff's Employment at DHL

Plaintiff was hired by DHL as a courier in 1985 at its JFK facility.  In 1993, at

Plaintiff's request, Plaintiff was transferred to DHL's Westbury station.  Thereafter, Plaintiff

voluntarily transferred to DHL's Farmingdale station.  In 2002, Plaintiff requested a "hardship

transfer" to the Islip Station in order to be closer to home to assist with his dying mother-in-law.

This request was granted by Local 295 in 2003 and Plaintiff was transferred to DHL's Islip

station located in Ronkonkoma, New York (the "ISP station").  Plaintiff remained at this station

2

until October 2006, the date of his final termination.

        As a driver, Plaintiff's job duties included delivering and helping to break down freight, delivering and picking up packages, scanning packages, and loading and unloading trucks.  Plaintiff also was a shuttle driver at the ISP facility.  As a shuttle driver, Plaintiff was responsible for taking an empty shuttle truck from the ISP station to DHL's JFK facility, to unload freight from an inbound plane onto DHL's truck, and drive the freight back to the ISP station for sorting and delivering.

        Plaintiff's regular shift was from 4 a.m. until 1 p.m.  Since approximately 2001, Jeffrey Sidorski ("Sidorski") was the District Field Services Manager at the ISP station.  As manager, Sidorski was responsible for managing the operations of the entire ISP station.  Sidorski was also the decision maker with regard to Plaintiff's final termination.

### The CBA

        Local 295 and DHL are parties to the CBA, which governs the terms and conditions of employment of couriers employed by DHL.[1]  Appendix B, Section III of the CBA concerns employee discipline.  Under this section,  "serious offenses" are categorized as Category A offenses that provide DHL with "just and sufficient cause for summary discharge."  Among the offenses specified as Category A offenses is "theft."  (CBA at 91.)  No definition of "theft" appears in the CBA.  According to Defendants, "theft" has consistently been interpreted by both DHL and Local 295 to include theft of company time.  Plaintiff testified that his understanding of theft of company time is "not working when you were directed to work and

---

[1]  The CBA was originally between Local 295 and Airborne Express.  Thereafter, DHL acquired Airborne Express and assumed its obligations under the agreement.

doing something else." (Pl.'s July 14, 2008 Dep. at 198.)

Section 22 of the CBA sets forth a dispute resolution procedure for grievances. Grievances go through a series of steps where either the employee or Local 295 will meet with representatives of management. Under the CBA, grievances involving a discharge are submitted directly to Step 2. An employee initiates the grievance process for a discharge by submitting a grievance in writing to his or her District or Station Manager after receiving written notification of such discharge. If the matter is not resolved at Step 2, the grievance can be taken to Step 3, which involves a review and decision by the Regional Field Services Manager or designee. If the employee is not satisfied with the Step 3 results, Local 295 can submit the grievance to its Executive Board to determine whether the union will pursue the grievance to arbitration.

***Plaintiff's Violations of DHL's Attendance Policy***

Under the CBA, Plaintiff was subject to progressive discipline for violations of DHL's attendance policy. In 2005, on three different occasions in April, August and November, Plaintiff was disciplined pursuant to the attendance/lateness discipline procedure under the CBA. According to Plaintiff, throughout these disciplinary processes, he informed the managers, supervisors and union officials involved, including Sidorski, that these attendance/lateness issues were a result of his problems at home and their physical and emotional effect on him. (Pl.'s April 17, 2009 Decl. ("Pl.'s Decl.") ¶ 11.)

***Plaintiff's Other Violations***

Plaintiff also received counseling about other violations of DHL's work policies from Sidorski and/or Mike Mackey ("Mackey"), an ISP station manager, on at least three separate occasions. The first time Plaintiff received counseling at the ISP station, Plaintiff

was driving a shuttle truck from the airport to the ISP station and parked the truck on the

eastbound side of Sunrise Highway.  Sidorski was driving westbound when he saw the truck and,

assuming it had broken down, went to see what had happened.  When Sidorski got out of the car,

he saw

Plaintiff having a conversation with a friend and asked him what had happened.  Plaintiff stated

that there was no problem and that he was just speaking with a friend.  At that point, Sidorski

instructed Plaintiff to return to the ISP station where Plaintiff received verbal counseling for his

poor judgment as the truck was parked while it was full of freight.

        The second time, on January 18, 2005, Plaintiff parked his truck on the side of

the road and was seen asleep by Mackey who saw the truck as he was driving into work.

Plaintiff explained to Mackey that he had to pull over to rest because the sun was in his eyes.

Thereafter, Mackey and Sidorski each met with Plaintiff and explained to him that although

safety precautions are appropriate and necessary, Plaintiff needed to immediately communicate

such issues to management or dispatch.

        The third time Plaintiff received counseling at the ISP station for violating

DHL's work rules, Sidorski had seen Plaintiff on a Saturday morning pull his DHL truck

into a 7-Eleven during his working time and get out of his vehicle.  Plaintiff explained that he

was going to make a phone call, but as he was only five minutes from the station, Sidorski

instructed Plaintiff to return to the station.   Sidorski and Paul Blasucci, Shop Steward for the

ISP station, met with Plaintiff, where it was explained to Plaintiff that he should have returned to

the station to make the phone call.

***Plaintiff's Three Terminations and Reinstatements***

Plaintiff was terminated and reinstated three times while employed at DHL.  First, in November 1994, Plaintiff was terminated for theft of company time while he was working at the Westbury station.   Specifically, Plaintiff admitted that he intentionally falsified his time records in an effort to be paid by DHL during periods in which he was at his home in Wantaugh and not working.  The station manager, Gary Chardavoyne, terminated Plaintiff for falsifying his cartage records.  Sidorski was in no way involved with the decision to terminate Plaintiff's employment at that time and had no role in the grievance process.  Plaintiff grieved the termination, which was upheld through each step of the grievance process under the CBA.  Thereafter, Local 295 pursued Plaintiff's case to arbitration in front of Stanley Aiges, whom the CBA designates as the contract arbitrator for all grievances.  Arbitrator Aiges found that Plaintiff engaged in theft of company time.  Although Arbitrator Aiges acknowledged that Plaintiff's offense was one "which arbitrators universally uphold the discharge penalty," Plaintiff was reinstated and his termination was reduced to a time served suspension without pay because other employees at the Westbury station had been treated less harshly for falsifying cartage reports at that time.  Plaintiff returned to work on March 6, 1995.  The CBA now provides that DHL's imposition of a lesser penalty for an offense in one instance shall not be treated as binding precedent for similar offenses by other employees in the future.

On August 29, 1995, Plaintiff was terminated a second time for leaving an envelope to be delivered in the front seat of his truck.  After exhausting the grievance procedures, Plaintiff's termination was reduced to an unpaid suspension, and he returned to work on November 13, 1995.

In January 2006, Plaintiff was terminated a third time for theft of company time

for falling asleep in a DHL truck at a Hess gas station while he was on the clock and being paid by DHL. Plaintiff claims he slept during a period of "dead time" for which he had no specific work assignment. After an investigation, Plaintiff was terminated by DHL for theft of company time. Local 295 pursued a grievance in connection with Plaintiff's termination, which was upheld at the Step 2 hearing on January 10, 2006. Subsequently, at the Step 3 hearing on January 19, 2006, Plaintiff's termination was reduced to a time served suspension. As part of DHL's agreement with Local 295 for Plaintiff's reinstatement with an unpaid time served suspension, Plaintiff signed a "last chance" agreement. The last chance agreement explicitly stated that the "Employee is forewarned that any future incident of like kind will result in the employee's immediate termination." (Decl. of Andrew S. Goodstadt, dated Feb. 20, 2009 ("Goodstadt Decl."), Ex. Y.) Plaintiff testified at his deposition that he understood the agreement to mean that if "he did the same thing . . . [he] would be fired." (Pl.'s July 14, 2008 Dep. at 357.) A last chance agreement is only effective for one year, after which an employee is given a clean disciplinary record.

***Plaintiff's Fourth and Final Termination***

On October 11, 2006, DHL again terminated Plaintiff for engaging in theft of company time. It is this termination that is the subject of the instant lawsuit. On October 9, 2006, after working his scheduled shift from 4 a.m. to 1 p.m., Plaintiff worked an additional afternoon shift because the ISP station was short a few drivers. On that day, Plaintiff had three separate gaps in his manifest, which are times when work was not performed, without management approval, when according to DHL, work was available and could have been performed. The first gap was 65 minutes, the second gap was 25 minutes, and the third and

longest gap was 124 minutes.

The following day, the supervisors and managers at the ISP station received the gap report from October 9, 2006, which listed the largest gaps from that day, as they do every morning.  Pursuant to daily practice, the supervisors and managers questioned the drivers who had the most gaps on their driver manifests to determine whether the gaps were justified, e.g., traffic accident, lack of work, customer not ready, etc.

In his interview with DHL representatives, Plaintiff's only explanation for the 65 minute gap was that he was in the bathroom for the entire hour.  He now supplements that explanation by claiming that he "suffered from gastrointestinal problems in the bathroom for that one hour gap consistent with [his] celiac disease."[2]  (Pl.'s Aff. ¶ 17.)  The first gap caused a total of six express service failures, where Plaintiff failed to timely deliver packages

Plaintiff explained the second gap, approximately 25 minutes, by stating that he returned to the ISP station as he was instructed to do so by his supervisor, Mike Garcia ("Garcia").  Garcia, however, stated in a letter that he did not call Plaintiff off his route before he had completed his deliveries and instead had instructed Plaintiff to finish his deliveries before returning to the station.

The third gap was between 1:09 p.m. and 3:13 p.m.  In his interview with DHL representatives, Plaintiff's explanation for this gap was that he was contacted by another DHL driver in the area who told him that he did not need any assistance.  Although Plaintiff claimed

---

[2]   Celiac disease "is a lifelong, digestive disorder affecting children and adults.  When people with [Celiac disease] eat foods that contain gluten, it creates an immune-mediated toxic reaction that causes damage to the small intestine and does not allow food to be properly absorbed."
http://www.celiac.org/index.php?option=com_content&view=article&id=3&Itemid=34

that he had called the dispatcher, he was unable to state what time he had contacted him and there was no record of any attempt by Plaintiff to contact dispatch or anyone at the ISP station. During the third gap, Plaintiff had two scheduled pickups that were ready between 2:00 p.m. and 3:00 p.m.  At 3:04 p.m., the dispatcher sent Plaintiff a text message informing him that one of the customers called to complain that no one picked up the packages during the scheduled pickup window, and was going to leave at 3:15 p.m.  Plaintiff thereafter picked up both packages outside of the scheduled service window in violation of DHL policy.

At the end of the meeting, Plaintiff was issued a "Letter of Investigation" informing Plaintiff that an investigation was being conducted into the gaps in his manifest that occurred on October 9, 2006.  Thereafter, a second meeting was held on October 11, 2006 with DHL representatives.  In response to Sidorski's request for any information to help explain his gaps, Plaintiff replied that he was in the bathroom during the first gap because he had problems with his stomach and had severe hemorrhoids.  Plaintiff explained that during the second gap he came back to the ISP facility and that there was no additional work.  Plaintiff also stated that he had contacted Mr. Smith, who did not need help, so he waited for his pickups during the third gap.  At the end of that meeting, Plaintiff was terminated from his employment with DHL because the gaps of October 9, 2006 were deemed to be theft of company time.  In addition, Plaintiff violated his last chance agreement, executed nine months earlier.

Plaintiff initiated grievance proceedings on October 11, 2006, and the termination was upheld at the Step 2 hearing with a finding that DHL had just cause for the termination.  A Step 3 hearing was thereafter held on October 19, 2006, and Plaintiff's termination was upheld.  After the Step 3 decision to uphold his termination, Plaintiff claimed

9

for the first time that he suffered a nervous breakdown during the third gap.  Plaintiff also now

states that he had an emotional breakdown related to his depression during this gap.  On October

24, 2006, the Local 295 Executive Board unanimously decided not to take Plaintiff's grievance

to arbitration.

***The Instant Action***

Following his termination from DHL, on April 17, 2007, Plaintiff filed the

instant lawsuit against DHL and Local 295 alleging that DHL terminated his employment in

contravention of the CBA and that Local 295 breached its duty of fair representation to Plaintiff

by failing to conduct a minimal investigation of Plaintiff's termination before refusing to engage

in arbitration.  Plaintiff also alleges that he suffered from depression and Celiac disease and that

DHL discriminated against him on the basis of his disabilities in violation of the NYSHRL.

Both DHL and Local 295 have moved for summary judgment.  DHL also moves to strike a

declaration offered by Plaintiff in opposition to DHL's motion for summary judgment.  For the

reasons that follow, Defendants' motions for summary judgment are granted.  DHL's motion to

strike is denied as moot.

## ***DISCUSSION***

### I.      *Motion for Summary Judgment - Legal Standards*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only

appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other

documentation demonstrates the absence of a genuine issue of material fact, and one party's

entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d

712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are

material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).  The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary

11

judgment motions.  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988).  Where the

non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's

burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an

essential element of the non-movant's claim.  *Id.* at 210-11.  Where a movant without the

underlying burden of proof offers evidence that the non-movant has failed to establish her claim,

the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not

'implausible.' "  *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

Summary judgment is generally inappropriate where questions of the defendant's

state of mind are at issue, *Gelb v. Board of Elections of the City of New York*, 224 F.3d 149, 157

(2d. Cir. 2000), and should thus be granted with caution in employment discrimination cases.

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *Carlton v.*

*Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000).  Nonetheless, "summary judgment

remains available to reject discrimination claims in cases lacking genuine issues of material

fact."  *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994).

## II.    *Hybrid Section 301/Fair Representation Claim*

### A.    *Applicable Law*

Plaintiff alleges that DHL breached the CBA by terminating Plaintiff's

employment without good cause and that Local 295's failure to process Plaintiff's grievance

through arbitration constitutes a breach of its duty of fair representation.  A suit, such as the

instant one, commenced by an employee alleging that the employer breached the CBA and that

the union breached its duty of fair representation in a grievance or arbitration proceeding is

known as a hybrid § 301/fair representation claim and is governed by two statutes.  Section 301

of the LMRA, 29 U.S.C. § 185, governs Plaintiff's claim that DHL violated the CBA.  *See Carrion v. Enter. Ass'n, Metal Trades Branch Local Union 638*, 227 F.3d 29, 33 (2d Cir. 2000).  Local 295's duty of fair representation to Plaintiff is implied under the scheme of the National Labor Relations Act, 29 U.S.C. § 151 et seq.  *Id.*

    An employee may sue either his employer or the Union, or both, in a hybrid § 301/fair representation claim but to prevail, the employee must demonstrate both (1) that the employer breached its collective bargaining agreement and (2) that the union breached its duty of fair representation.  *Id.  See also Sanozky v. Int'l Ass'n of Machinists and Aerospace Workers*, 415 F.3d 279, 282 (2d Cir. 2005).  Failure to establish that the union breached its duty of fair representation necessarily precludes the claim against the employer.  *See United Parcel Serv., Inc. v. Mitchell*, 451 U.S. 56, 62 (1981) ("[T]he indispensable predicate for such an action is not a showing under traditional contract law that the [employee's] discharge was a breach of the collective-bargaining agreement, but instead a demonstration that the Union breached its duty of fair representation."), *overruled on other grounds by DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151 (1983); *Bynog v. SL Green Realty Corp.*, 2007 WL 831740, at *10 (S.D.N.Y. Mar. 20, 2007) ("To prevail against her employer, the employee must first show that the union breached its duty of fair representation.").  " '[A] union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith.' " *Sanozky*, 415 F.3d at 282 (quoting *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998)).  " '[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational.' " *Id.* at 282-83 (quoting *Air Line Pilots Ass'n Int'l v. O'Neill*,

499 U.S. 65, 67 (1991)).  "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong."  *White v. White Rose Food*, 237 F.3d 174, 179 (2d Cir. 2001) (quoting *Marquez*, 525 U.S. at 45-46). "Tactical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach."  *Barr v. United Parcel Serv., Inc.*, 868 F.2d 36, 43 (2d Cir. 1989).  Only if the Plaintiff established the first element of a fair representation claim, must he then prove that any damages he suffered were caused by the union's breach.  *See White*, 237 F.3d at 179.

  **B.**  ***Local 295 did not Breach its Duty of Fair Representation***

    The Court finds that Local 295 did not breach its duty of fair representation in its investigation of Plaintiff's grievance or because it decided not to process Plaintiff's grievance to arbitration.  The record is devoid of any evidence indicating that Local 295's actions were arbitrary, discriminatory, perfunctory, or in bad faith.  To the contrary, the record establishes that Local 295 diligently pursued Plaintiff's grievance through the third step grievance hearing and made an informed decision not to pursue arbitration only after it determined that arbitration would not be successful in light of, inter alia, the facts that: (1) Plaintiff was on a last chance agreement, which was less than one year old and for the same offense, which indicated that the penalty for a subsequent violation was his termination; (2) Local 295 has not taken any case involving an employee's theft of time to arbitration since 1995; and (3) Plaintiff made contradictory statements to DHL and Local 295 about the reasons for the gaps of time on his manifest.  Given the weakness of Plaintiff's claims, the Court finds that Local 295 was well within its discretion not to take Plaintiff's grievances to arbitration.  There is no "absolute right"

14

to have a grievance taken to arbitration, nor does a union "breach its duty of fair representation . . . merely because it settled the grievance short of arbitration." *Vaca v. Sipes*, 386 U.S. 171, 191 (1967).

Finally, Plaintiff's conclusory assertion that Vincent Bruno ("Bruno"), the Local 295 representative who processed Plaintiff's grievance, conducted a superficial investigation of his termination grievance, without more, is insufficient to raise a genuine issue of material fact, particularly in light of Plaintiff's admission at his deposition that he couldn't think of anything else Bruno could have done:

> Q.    Is there any witness that Mr. Bruno could have interviewed to find
>        out more about what happened?
>
> A.    Not that I know of.
>
> Q.    Are there any documents that Mr. Bruno could have reviewed that
>        he didn't review that would have shed more light on the situation?
>
> A.    Not that I know of.
>
> Q.    Are there any further steps that Mr. Bruno needed to take to
>        investigate your grievance?
>
> A.    Not that I know of.

(Pl.'s Aug. 26, 2008 Dep. at 80-81.)  Plaintiff also testified that he knew Bruno did his "hardest" to get Plaintiff's job back.  (*Id.* at 68.)  Although Plaintiff now identifies several witnesses he claims Bruno should have interviewed, there is no evidence in the record suggesting that any of these witnesses could have provided evidence to support Plaintiff's grievance.  Ultimately, Plaintiff relies on his own subjective belief that he would have won his grievance if taken to arbitration.  Local 295, on the other hand, has submitted two declarations by Bruno detailing all of the steps he took in investigating Plaintiff's grievance, including a list all of the

15

documentation he reviewed, and the reasons he voted not to take Plaintiff's claim to arbitration. Given this evidence, Plaintiff's conclusory allegation are insufficient to defeat summary judgment.

Accordingly, the Court finds as a matter of law that the record does not permit a reasonable finding that Local 295 breached its duty of fair representation. Thus, Plaintiff cannot establish a hybrid Section 301/fair representation claim against either defendant as a matter of law.

### III.     Plaintiff has Failed to Raise a Genuine Issue of Material Fact with Regard to his Discrimination Claims

Plaintiff alleges that he was discriminated against on the basis of his disabilities in violation of the NYSHRL.  Specifically, Plaintiff claims that he suffers from Celiac disease and depression and that DHL used the gaps in Plaintiff's activity log as a pretext to terminate his employment on the basis of his disabilities.  For the reasons stated below, Plaintiff's discrimination claim is dismissed.

### A.     The McDonnell-Douglas Burden-Shifting Methodology Applies to Plaintiff's NYSHRL Claims

The burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to discrimination claims brought under the NYSHRL.  *See Frank v. Lawrence Union Free Sch. Dist.*, – F. Supp. 2d –, 2010 WL 711937, at *6 (E.D.N.Y. Feb. 22, 2010) (citing *Ferraro v. Kellwood Co.*, 440 F.3d 96, 99-100 (2d Cir. 2006)).[3]

_____

[3]  Although claims under the Americans With Disabilities Act (the "ADA"), 42 U.S.C. § 12101 et seq. and the NYSHRL are both analyzed pursuant to same burden-shifting framework, "the definition of a disability under New York law is not coterminous with the ADA definition."

Under *McDonnell-Douglas* and its innumerable progeny, (1) a plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell-Douglas* framework and its presumptions and burdens disappears, leaving the sole remaining issue of "discrimination vel non," and thus (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

The burden of establishing a prima facie case of employment discrimination has been described as "modest," *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994), or even "minimal." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves*, 530 U.S. at 143.

Likewise, the employer's burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory. *See Seils v. Rochester City Sch. Dist.*, 192 F. Supp. 2d 100, 111 (W.D.N.Y. 2002) (citing, *inter alia*, *Meiri*, 759 F.2d at 995 (2d Cir. 1985)), *aff'd*, 99 F. App'x 350 (2d Cir. 2004). Federal courts do

---

*Giordano v. City of N.Y.*, 274 F.3d 740, 754 (2d Cir. 2001) (citing, inter alia, *State Div. of Human Rights v. Xerox Corp.*, 65 N.Y.2d 213 (1985)).

not have a "roving commission to review business judgments," *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n.8 (7th Cir. 1987)), and may not "sit as super personnel departments, assessing the merits — or even the rationality — of employers' non-discriminatory business decisions." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991). Thus, "[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

If the employer carries its burden, the employee may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Bombero v. Warner-Lambert Co.*, 142 F. Supp. 2d 196, 203 n.7 (D. Conn. 2000) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999), and citing *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996)), *aff'd*, 9 F. App'x 38 (2d Cir. 2001). However, to rebut an employer's proffered non-discriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri*, 759 F.2d at 998.

"[I]n some circumstances, a prima facie case plus falsity of the employer's

18

explanation can, without more, be enough to support a reasonable finding that prohibited discrimination has occurred, and thus that a plaintiff may, under those circumstances, reach the jury on this evidence and without additional evidence, but . . . in other circumstances, a prima facie case, combined with falsity of the employer's explanation, will not be sufficient." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 155-56 (2d Cir. 2000) (citing *Reeves*, 530 U.S. at 147).   The Court should take a case-by-case approach, examining the following factors: "[T]he strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves*, 530 U.S. at 148-49.

**B.      *Plaintiff has Failed to Present Any Evidence Suggesting that his Termination was the Result of Discriminatory Animus***

To establish a prima facie case of discrimination, Plaintiff must show that: (1) he belonged to a protected class, (2) was qualified for the position he held, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent.  *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003).  DHL does not dispute, for purposes of the present motion, that Plaintiff has established the first three elements of his prima facie case, viz. that he was disabled, that he was qualified for the position, and that he was terminated. DHL contends, however, that Plaintiff cannot prove that he was terminated under circumstances giving rise to discrimination.  The Court agrees.

**1.      *DHL had no Notice of Plaintiff's Celiac Disease***

Assuming, without deciding, that Plaintiff is afflicted by a disability as defined under the NYSHRL, DHL is still entitled to summary judgment with regard to Plaintiff's Celiac disease claim because there is no evidence in the record suggesting that anyone at DHL had any

knowledge of Plaintiff's disability prior to termination.  It is, of course, elemental that an employer could not have discriminated against a plaintiff because of his disability if it was unaware that the plaintiff was, in fact, disabled.  *Raytheon Co. v. Hernandez*, 540 U.S. 44, 55 n.7 (2003) (finding that "[i]f [an employer] were truly unaware that . . . a disability existed, it would be impossible for [its] hiring decision to have been based, even in part, on [plaintiff's] disability. And, if no part of the hiring decision turned on [plaintiff's] status as disabled, [plaintiff] cannot, ipso facto, have been subject to" discrimination); *Young v. Westchester County Dep't of Soc. Servs.*, 57 Fed. App'x 492, 494 (2d Cir. 2003) (unpublished) ("A defendant cannot be liable under the ADA unless it had information at the time of its pertinent decisions that would have permitted a reasonable employer to conclude that the plaintiff was, in fact, disabled.") (citations omitted).

Here, although Plaintiff testified at his deposition and averred in his affidavit that he recalls being diagnosed with Celiac disease in 2002, there is no evidence that he communicated this diagnosis to DHL before his termination.  In fact, the evidence is to the contrary.  First, Plaintiff admitted at his deposition that he was not aware of any document in connection with his employment at DHL in which he informed DHL that he suffered from any digestive problems or Celiac disease.  (Pl.'s July 13, 2008 Dep. at 97.)  Notably, however, on May 14, 2003, Plaintiff verified in writing on his "Medical Examination Report for Commercial Driver Fitness Determination" that was submitted to the Department of Transportation for his commercial license that he did not suffer any illness or injury during the last five years and that he did not suffer from any digestive problems.  (Goodstadt Decl., Ex. LL at 390.)  Over two years later, on June 21, 2005, Plaintiff again certified in writing in a renewed Report that he did

20

not have any digestive problems.  (*Id.* Ex. MM at DHL 50028.)  Plaintiff also verified that he was not taking any medication.  (*Id.*)

Second, Plaintiff testified at his deposition that he could not recall telling anyone at DHL that he suffered from Celiac disease.  (Pl.'s July 14, 2008 Dep. at 230-31.)  In his brief in opposition to summary judgment, Plaintiff states that "although he did not explicitly identify himself as having Celiac disease," his "debilitating condition was well-known among supervisors and co-workers during his four years at Islip Station."  (Pl.'s Mem. of Law in Opp'n at 6.)  In support of this assertion, Plaintiff explains that he spent long periods of time in the bathroom due to diarrhea and/or constipation and thus DHL was on notice of his alleged disability.  Plaintiff's leap in logic is wholly unwarranted.  Although " 'some symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability,' "  *Young v. Westchester County Dep't of Soc. Servs.*, 57 Fed. App'x 492, 494 (2d Cir. 2003) (unpublished) (quoting *Hedberg v. Indiana Bell Telephone Co.*, 47 F.3d 928, 934 (7th Cir. 1995)), there is no evidence that that was the case here.  Plaintiff's symptoms could have just as easily been explained by a temporary stomach bug as by some long-term ailment.  *Cf. Hedberg*, 47 F.3d at 94 ("The ADA hardly requires that merely because some perceived tardiness and laziness is rooted in disability, an employer who has not been informed of the disability, and who has no reason to know of the disability, is bound to retain all apparently tardy and lazy employees on the chance that they may have a disability that causes their behavior.  The ADA does not require clairvoyance.").  Accordingly, to the extent Plaintiff's disability claims are based on Celiac disease, his claims are dismissed.

**2.**      ***There is No Evidence from which a Reasonable Factfinder could Infer
that Plaintiff was Terminated under Circumstances Giving Rise to an
Inference of Discriminatory Intent Based upon Plaintiff's Depression***

The evidence supporting Plaintiff's claim that DHL had notice of Plaintiff's
alleged depression is scant.  In the two Medical Examination Reports referenced above, Plaintiff
also indicated that he did not suffer from any nervous or psychiatric disorder, specifically severe
depression.  (Goodstadt Decl., Ex. LL at 390 and Ex. MM at DHL 50028.)  In addition, as with
his alleged Celiac disease, at his deposition Plaintiff testified that he was not aware of any
document in connection with his employment at DHL in which he informed DHL that he
suffered from depression.  (Pl.'s July 13, 2008 Dep. at 249-50.)  However, Plaintiff did testify at
his deposition that sometime in 2004 or 2005 after Plaintiff was taken away by ambulance for
what he believed was a heart attack, Plaintiff later told Sidorski that he had an anxiety attack that
day and had been on medication for depression.  (*Id.* at 307-08.)  Sidorski, however, testified that
he was never made aware that Plaintiff suffered from depression or any mental illness at any
time during his employment.  (Sidorski's Oct. 8, 2008 Dep. at 39-40.)  Nevertheless, even
assuming that Sidorski knew of Plaintiff's depression, there is no evidence in the record
suggesting a nexus between Plaintiff's termination and his alleged disability.

Plaintiff attempts to establish causation by arguing that other similarly situated
employees in Plaintiff's region caught engaging in theft of company time were treated more
favorably in that they were not terminated by DHL.  DHL, however, has produced documentary
evidence demonstrating that in fact (1) each of these employees was initially terminated for theft
of company time, though several were reinstated through the grievance procedure; and (2) none
of these employees was on a last chance agreement like Plaintiff.  (*See* Reply Decl. of Andrew S.

Goodstadt, dated May 15, 2009, Exs. EEE-LLL.)  Thus, it cannot be said that these employees, who were not on a last chance agreement, were similarly situated to Plaintiff.  *See Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (noting that in deciding whether employees are similarly situated, courts must consider "whether the conduct for which the employer imposed discipline was of comparable seriousness.").  In fact, Plaintiff has failed to identify any DHL employee who, while on a last chance agreement, subsequently committed a similar offense and was then not terminated.

Even assuming Plaintiff could establish a prima facie case of discrimination, DHL has easily met its burden of articulating a legitimate, non-discriminatory reason for Plaintiff's termination, viz. Plaintiff's theft of company time while on a last chance agreement.  Once an employer has articulated a legitimate, non-discriminatory reason for its actions, the plaintiff then has the burden of showing that the stated reason was pretextual, and that more likely than not discrimination was a motivating factor leading to the adverse employment action.  Here, Plaintiff has failed to offer any  evidence which would raise a genuine issue of material fact as to whether the legitimate non-retaliatory reasons given by DHL for Plaintiff's termination were a subterfuge for illegal discrimination based on Plaintiff's depression.  Accordingly, Plaintiff's depression-based disability claim is dismissed.[4]

---

[4] Plaintiff claims, for the first time as part of his opposition papers to summary judgment, that DHL failed to provide him with reasonable accommodations upon notice of his disabilities in violation of the NYSHRL.  The Complaint does not plead a cause of action against DHL for failure to accommodate and Plaintiff has not moved for leave to amend.  Moreover, Plaintiff testified at his deposition that he did not remember ever requesting any accommodation during the entire time he was at DHL for any illnesses.  (Pl.'s July 14, 2008 Dep. at 310.)  In any event, such a claim would fail based upon the present record because, inter alia, Plaintiff has presented no evidence to meet his burden of showing that an accommodation exists that would permit Plaintiff to "perform the job's essential functions" despite his depression.  *Borkowski v. Valley*

23

*CONCLUSION*

For the foregoing reasons, Defendants' motions for summary judgment are

GRANTED.  Defendant DHL's motion to strike is denied as moot.  Upon entry of judgment, the

Clerk shall close this case.

**SO ORDERED.**

Dated: Central Islip, N.Y.
       March 26, 2010

                                        /s
                                        Denis R. Hurley,
                                        United States District Judge

---

*Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995).  Plaintiff has not explained what
accommodation DHL could provide short of permitting him to have unexplained gaps of time
during the work day and missing scheduled pickups and deliveries that would still have allowed
Plaintiff to perform the essential functions of his job.